PENNSYLVANIA COAL COMPANY, PROSECUTOR, v. TOWN-SHIP OF SADDLE RIVER, IN THE COUNTY OF BERGEN, ET AL., RESPONDENTS.

Submitted March 17, 1921—Decided June 1, 1921.

The federal control and regulation of the coal industry under the Lever act of 1918, and executive regulation in pursuance thereof, conferred no immunity from state taxation as respects coal otherwise taxable under state law.

---

On *certiorari*.

Before Justices SWAYZE, PARKER and BLACK.

For the prosecutor, *John M. Emery.*

For the defendant township, *Mackay & Mackay.*

For the Bergen county board of taxation, *Clarence Mabie.*

The opinion of the court was delivered by

PARKER, J.    The question is as to the liability to taxation on October 1st, 1919, of a stored supply of anthracite coal, at that date physically situate in the township above named. Apart from the effect, if any, of a technical state of war, and the attendant war legislation of the United States, executive orders of the President and other national officials, and conditions incident thereto, there is no doubt that the status of this property as to taxability is indistinguishable from that dealt with in such cases as *Lehigh and Wilkes Barre Coal Co.* v. *Junction,* 75 *N. J. L.* 68, 922; *Susquehanna Coal Co.* v. *South Amboy,* 76 *Id.* 412; affirmed in 77 *Id.* 796, and *Same* v. *Same,* 228 *U. S.* 665; 57 *L. Ed.* 1015; no interstate commerce feature being involved.

The valuation fixed by the local assessor was raised by the county board of taxation, and some point is made of this. But prosecutor's broad claim is that the coal in question is altogether exempt from local taxation because of the wartime federal control; and this is argued in several phases.

If so exempt, it must be as a result of some express provision in the federal constitution or statutes, for no such exemption under the law of this state is even suggested. The nearest approach to an exemption in New Jersey is to be found in the clause relating to "the property of the United States and of the State of New Jersey." *Pamph. L.* 1918, *p.* 849; a re-enactment of paragraph 2, *Comp. Stat., p.* 5078. It does not seem to be claimed that the coal is the *property* of the United States; in such a situation the United States would either ignore the tax or proceed in its own way to invalidate it. That it is the property of the prosecutor must be demonstrated for present purposes by the very fact that prosecutor is in this court protesting against the tax. The

question, then, seems to be this: Has the nation under its war powers so taken hold of prosecutor's property and interfered with its normal handling as private property as to indicate its clear intent that pending federal control it should be exempted from local taxation? For, unless the intent to exempt be clear, the liability to tax remains unimpaired. *Cooper Hospital* v. *Camden,* 68 *N. J. L.* 691; *Id.,* 70 *Id.* 478; *Rosedale Cemetery Association* v. *Linden,* 73 *Id.* 421; *Mausoleum Builders* v. *State Board of Taxes,* 88 *Id.* 592; *Fairview Heights Cemetery Co.* v. *Fay,* 90 *Id.* 427. With these principles in mind, we take up the specific points made by prosecutor.

The first invokes article 1, section 8 of the federal constitution—the power to make war, raise and support armies and make laws necessary to carry out those provisions. This, of course, is unquestionable.

Secondly, that under the war power congress may regulate subjects pertaining to the national defence, including the coal supply. This is also indubitable; the complete authority of congress in war time is fully recognized in this state. *Keppelman* v. *Palmer,* 91 *N. J. Eq.* 67.

Thirdly, that express prohibition of state taxes by federal statute is not essential, to supersede the state taxing laws. This may be conceded, for present purposes, provided the intent to override the state tax is otherwise clearly indicated by the language of the federal statute.

Fourthly, the state tax interferes with the operations of the federal government, for—

Fifthly, prosecutor in performing its duties as a distributor of coal under federal supervision was obliged to store this coal at the place in question.

Sixthly, the tax tends to limit facilities for storage and distribution.

Seventhly (presumably, because of the foregoing), such tax tends to obstruct and control the operation of a federal law in exercise of the war power.

Eighth, the tax is, in effect, a tax on constitutional war measures and agencies of the nation.

These last five points seem to us to amount to very much the same thing. The underlying argument is, and must be, that any state tax bearing on property whose disposition and management are under control of the federal government in war time for war purposes is tantamount to a tax against the federal government, and as such invalid; and that the tax in question is in this class. We shall recur to this presently.

The ninth point is, that the tax is invalid because it diminishes the compensation (accruing to the dealer) fixed by the President for coal under the Lever act (40 *Stat. at L., ch.* 53, *p.* 276), and

Ten, because it interferes with the operation of the executive regulations under the Lever act. This point has been already made in substance but in different language.

Eleventh, that federal control had not been abandoned on October 1st, 1919. This may be conceded, though the case seems to show it had been greatly relaxed.

Twelfth, that the Lever act was then in full force, which seems to be true.

Thirteenth, that the fourteenth amendment was infringed by the county board "singling out" the coal in question for a raise in valuation to its full value without doing the same to other property. This is a different matter and may be dismissed in a word. We find no evidence, and prosecutor cites none, indicating that the county board discriminated in any such manner, but if it appraised the coal at its full market value, that is what the law called for, and if this was not done in other cases, prosecutor had its remedy under the Tax act. *Pamph. L.* 1918, *p.* 879, § 701.

On the main question, we are unable to gather from the language of the federal statutes or of executive proclamations or regulations thereunder any intent to interfere with the ordinary collection of state and municipal revenue by taxation of property in any case where that property has been left in the hands of its owners, subject to regulation in the public interest. No one will claim that a public utility should escape taxation because its rates are controlled; and the control and regulation of necessaries of life in war time are simply tem-

porary adaptations of the same principle. Food and fuel, two of the principal necessaries, were selected for such control. To the dealers in them the government said: You must not hoard; you must not charge more than what we consider a fair price, for some things we fix a minimum price, such and such commissions are allowed and no more; you must pay your men a minimum wage, and so on. This is exactly what the government has been doing to the railroads for years; their rates have been regulated and the wages of their employes, directly or indirectly, increased, but not a word has ever been said by anyone, so far as we know, about exempting them from state taxes because of federal interference. On the contrary, when the government took over the roads it expressly provided for payment of state taxes. *Act of March* 21st, 1918, ch. 25, § 1; 40 *Stat. at L., p.* 451.

A somewhat similar question was raised many years ago touching the Union Pacific railroad as a corporation under the ægis of the United States, and it was held not exempt from state taxation. *Thomson* v. *Union Pacific Railroad Co.,* 9 *Wall.* 579; and this was substantially reiterated in *Union Pacific Railroad* v. *Peniston,* 18 *Id.* 5. The state power of taxation was fully upheld even as against a federal agency.

As remarked by Chief Justice Chase in the Thomson case: "We perceive no limits to the principle of exemption which the complainants seek to establish." Every stock of wheat, rye or other grain, cotton-seed and its products, milk and its products, canned goods, sugar, &c., in the hands of dealers who are required to be licensed by the food administration, as well as the immense coal and fuel interests coming within the portion of the Lever act now invoked and regulations thereunder "might claim the benefit of the exemption." To us it is inconceivable that congress ever intended any such drastic and all-pervading immunity from taxation. Not one hint of it is intimated in the language of either congress or the executive; and it is safe to say that if such intent had been present it would have been somewhere expressed or plainly implied.

The tax will be affirmed, with costs.