INDEPENDENT WAREHOUSES, INC. ET AL. *v.* SCHEELE, RECORDER OF THE TOWNSHIP OF SADDLE RIVER, ET AL.

No. 83.   Argued December 16, 1946.—Decided April 14, 1947.

*Duane E. Minard* argued the cause for appellants. With him on the brief were *Clement K. Corbin, Willis T. Pierson* and *Edward A. Markley.*

*Harry Lane* and *Ralph W. Chandless* argued the cause, and *Mr. Lane* filed a brief, for appellees.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

An ordinance of Saddle River Township, New Jersey, forbids carrying on the business of storing goods for hire

except upon the payment of an annual license tax.[1]   Independent Warehouses, Inc., and Thompson, an agent of that company, have been convicted and fined for conducting such a business without procuring the license or paying the tax.   The convictions have been sustained by New Jersey's highest court.[2]   The appeal here seeks to have that judgment reversed on the basis that the business done was exclusively interstate and consequently the application made of the ordinance contravenes the commerce clause of the Federal Constitution, Art. I, § 8.   Fourteenth Amendment objections also are raised.[3]

The main thrust of the argument has been toward the commerce clause phase of the case.   In this the controversy is of the familiar "interruption" or "cessation" type.   The issue accordingly requires only a determination of the proper application to be made of well-established legal principles to the particular circumstances.   It is whether the cessation taking place in the movement of goods interstate, as shown by the record, is of a nature which permits the state or a municipality to tax the goods or services, here the business of storing them, rendered in connection with their handling.[4]

The governing principles were stated in *Minnesota* v. *Blasius,* 290 U. S. 1, 9–10, as follows:

". . . the States may not tax property in transit in interstate commerce.   But, by reason of a break in the

---

[1] The material terms of the ordinance appear at note 9 *infra* and text.

[2] See text Part I *infra*.   A prior suit in a federal district court to enjoin enforcement was dismissed because of the existence of a "plain, speedy, and efficient remedy" in the state courts.   *Independent Warehouses* v. *Saddle River Township,* 52 F. Supp. 96; 28 U. S. C. § 41 (1).

[3] Those objections are discussed in Part III of this opinion.

[4] "A non-discriminatory tax upon the business of storing" goods which are not yet in interstate commerce is not forbidden.   *Federal Compress Co.* v. *McLean,* 291 U. S. 17, 21.

transit, the property may come to rest within a State and become subject to the power of the State to impose a non-discriminatory property tax.[5]  Such an exertion of state power belongs to that class of cases in which, by virtue of the nature and importance of local concerns, the State may act until Congress, if it has paramount authority over the subject, substitutes its own regulation.  The 'crucial question,' in determining whether the State's taxing power may thus be exerted, is that of 'continuity of transit.' *Carson Petroleum Co.* v. *Vial*, 279 U. S. 95, 101.

"If the interstate movement has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the State's power to tax it. . . .  If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement. . . . Formalities, such as the forms of billing, and mere changes in the method of transportation do not affect the continuity of the transit.  The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied. . . .

"Where property has come to rest within a State, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the State, or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the State and is thus subject to its taxing power."

---

[5] See note 4.

Since the circumstances characterizing the interruption are of controlling importance, we turn to the details of the movement and of the stoppage shown by the record.

## I.

The suit is the culmination of a controversy extending back to 1939, with earlier litigious chapters in the state and federal courts. It grows out of the operation of facilities for storing and handling coal under various arrangements between the Erie Railroad Company and other corporations affiliated for this and other enterprises by stock ownership or by contract.

The Pennsylvania Coal Company is a wholly owned subsidiary of Erie. It owns and operates coal mines in Pennsylvania. In 1901 it acquired 67.25 acres of land in Saddle River Township, New Jersey. This acreage and its facilities, known as Coalberg, are located on the New York, Susquehanna and Western Railroad and perform functions connected with that road's operations not material to this cause. Coalberg also is connected directly with the Bergen County Railroad, a freight cutoff of Erie. Its chief purpose, and the only one relevant to this controversy, is to provide storage for coal shipped in from the Coal Company's Pennsylvania mines and later shipped out to various destinations.

Prior to 1939, Coalberg was operated by the Coal Company or its lessees as a private business, not as a public utility. During this time the Township levied personal property taxes upon the coal in storage, assessing and collecting them from its owners.[6] These were, as they are now, chiefly coal distributors using Coalberg's storage facilities, principally because of their accessibility to distributing centers, especially in the vicinity of New York

---

[6] In 1921 the New Jersey Supreme Court sustained the imposition of these taxes against attack on various grounds. *Pennsylvania Coal Co.* v. *Saddle River*, 96 N. J. L. 40.

City, and to shipping facilities both by rail and by water.[7]

In 1939, however, by arrangements to be set forth involving Erie, the Coal Company and Independent Warehouses, Coalberg was converted into a public utility to serve shippers of coal on Erie lines. Under New Jersey law, goods stored in warehouses conducted for hire are exempted from personal property taxes. Rev. Stat. N. J. § 54:4–3.20. The Township, despite the change in Coalberg's mode of operation, continued to levy such taxes on the stored coal until the 1940 assessment was invalidated in the state courts. *Pattison & Bowns* v. *Saddle River Township,* 129 N. J. L. 135; 130 N. J. L. 177.

The municipality's resulting loss in revenue amounted to about eight per cent of the total collected for local, county and state purposes. To make up for this, as its brief here candidly admits, the Township enacted the ordinance now in question, acting under other provisions of state law. N. J. Stat. Ann. §§ 40:52–1, 40:52–2. The effect was to shift the direct incidence of the tax from the owners of the coal, *i. e.,* the shipper-distributors, to the operator of the storage business and to change its character from a direct property tax to that of a license or franchise tax for the privilege of conducting that business in the state. The amount of revenue thus produced, though in dispute, substantially will repair the loss suffered from invalidation of the property tax. This suit is the outgrowth of the Township's effort to enforce the new taxing provisions.

It is necessary to state in some detail the arrangements made in 1939 by which the change was brought about in

---

[7] Coalberg is located conveniently to tidewater ports, as well as rail facilities for distribution in northern New Jersey and elsewhere. The distributors using Coalberg's facilities forward their coal not only to the near-by metropolitan area of New York City and northern New Jersey, but also to the New England States.

the mode of operating Coalberg. An agreement then made between the Coal Company and Erie provides that the former shall operate Coalberg "as a public service facility for shippers of prepared anthracite coal on Erie lines desiring storage space in accordance with and under the rates named in a certain Tariff on file with the Interstate Commerce Commission and the Public Utilities Commission of the State of New Jersey . . . ." The agreement recites that it is made in view of the considerations that the Coal Company has no need for Coalberg's storage facilities and that they are of use to Erie in affording "facilities for the storage of prepared anthracite coal for shippers on Erie lines whereon said Coalberg Storage Yard is located so that shipments of coal may not be diverted to other and competing lines on which facilities for coal storage are available . . . ." Erie pays the net monthly loss, if any, of operating the yard and the Coal Company remits to Erie the net monthly surplus, if any. Erie also undertakes to maintain an agent at Coalberg duly authorized on its behalf to issue warehouse receipts for coal placed in storage by shippers.

The Coal Company has discharged the operating function under its agreement with Erie by an arrangement also made in 1939 with Independent Warehouses, which is a New York corporation engaged in the warehousing business. The Coal Company leased Coalberg to Independent Warehouses for $1.00 a year and the latter undertook to operate the plant for a consideration which now amounts to approximately $500 a year. The agreement between the Coal Company and Erie governs the manner of Coalberg's operation by Independent Warehouses.

Under these arrangements purchasers from the Coal Company who ship coal from the mines designate the destination on the shipping papers. If they designate Coalberg, the coal is sent there in railroad cars. It is unloaded to the storage pile where it is kept until ordered out

by the owner.   It is then reloaded into railroad cars, and when it is reshipped there is a new billing to the new destination.   Most of the coal, after it has been stored, goes to states other than New Jersey.   Some, however, is marketed in New Jersey.   It is disputed whether there is any local distribution in the Township, but if so the amount is comparatively insignificant.

The financial arrangements under the governing tariff are as follows.   On arrival of the shipments at Coalberg the transportation charges on the movement from the mine to Coalberg are paid to the Erie freight agent at Coalberg.   When the coal is moved again after storage, the remainder of the through tariff rate from the point of original shipment at the mine in Pennsylvania is paid. This arrangement is known as the transit privilege.   "The privilege of transit enables grain [here coal] to be shipped from point A to point B, there to be stored, marketed, or processed, and later reshipped to point C at a rate less than the combination of the separate rates from A to B and B to C."   *Board of Trade* v. *United States*, 314 U. S. 534, 537–538, and authorities cited.

The storage facilities given to shippers are free for a period of two years,[8] although a charge is made by Erie for unloading the cars into the stock pile and for reloading the cars for reshipment.   A charge is also made by Independent Warehouses upon such coal owners as obtain warehouse receipts from it.

---

[8] The tariff provides: "The period of time allowed for the storage privilege and protection of the through rate from point of origin to ultimate destination shall be two (2) years from date of delivery at storage point, as shown on the inbound freight' (expense) bill.   The Erie Railroad reserves the right to require owners to remove their coal at the expiration of the two years period.   Any coal which is not reshipped within two (2) years will lose the privilege of being reshipped at the through rates from point of origin to destinations beyond the storage yard . . . ."

78

The licensing ordinance applied in this case was adopted in 1943, following upon the New Jersey decision in *Pattison & Bowns* v. *Saddle River Township, supra.* The ordinance provides:

> "No person, firm or corporation shall conduct or carry on the business of the storage of personal property in a warehouse engaged in storing goods for hire or work in, occupy, or, directly, or indirectly in any manner whatsoever, utilize any place or premises in which is conducted or carried on the storage of personal property in a warehouse engaged in the business of storing goods for hire, unless and until there shall be granted by the Township Committee of the Township of Saddle River in accordance with the terms of this ordinance, and shall be in force and effect, a license to conduct said business for the place and premises in or at which said business shall be conducted and carried on."

The ordinance specifies that for the license there shall be charged and collected in advance an annual fee of three-quarters of a cent for each square foot of ground in the Township where the business is carried on. There is also a penalty clause,[9] in addition to other provisions not now pertinent.

---

[9] "Any person, firm or corporation who shall violate any term or provision of this ordinance shall upon conviction thereof be subject to imprisonment in the County Jail or in any place provided by the Township of Saddle River for the detention of prisoners, for a term not exceeding ninety (90) days or to a fine not exceeding Two Hundred Dollars ($200.00), or both. Any person so convicted may, in the discretion of the Magistrate by whom he was convicted, in default of the payment of any fine be imprisoned in the County Jail or place of detention provided by the Township of Saddle River, for any term not exceeding ninety (90) days. . . . Each day that a violation of any of the terms or provisions of this ordinance shall continue shall constitute a separate offense."

Independent Warehouses did not apply for the license or pay the tax for 1943. Consequently that company and Thompson were convicted in the Magistrate's Court before appellee Scheele, the Recorder of the Township, for having violated the ordinance by conducting the storage operations at Coalberg without complying with its requirements. Each was fined $200.[10] The Coal Company and Erie were allowed to intervene when the case went before the New Jersey Supreme Court, because of their obvious interest in the outcome of the litigation. That court held the ordinance unconstitutional as an undue burden on interstate commerce and reversed the convictions. 132 N. J. L. 390. In turn the New Jersey Court of Errors and Appeals reversed the Supreme Court's determination. 134 N. J. L. 133. It held that the ordinance was valid under the provisions of state law, and that neither the commerce clause nor the Fourteenth Amendment guaranties relied upon had been infringed. The case comes here on appeal, pursuant to § 237 (a) of the Judicial Code. See *King Mfg. Co.* v. *Augusta,* 277 U. S. 100; *Jamison* v. *Texas,* 318 U. S. 413, 414.

## II.

That the storage of the coal is part of a transit privilege does not in itself sustain appellants' claim that the interstate movement had not stopped sufficiently for the state's taxing power to attach when the coal reached and was stored in Coalberg. Cf. *Minnesota* v. *Blasius, supra; Bacon* v. *Illinois,* 227 U. S. 504. It has long been recognized that transit privileges rest "upon the fiction that the incoming and the outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destina-

---

[10] Thompson was to be imprisoned for 90 days in the event of default in payment of his fine.

tion." *Central Railroad Co.* v. *United States,* 257 U. S. 247, 257. See also *Atchison, Topeka & Santa Fe R. Co.* v. *United States,* 279 U. S. 768, 779–780. Of course this fiction, which may be desirable for ratemaking or other purposes, cannot control the power of a state or municipality to tax activities properly subject to exercise of that power apart from the fiction's application to them.

Indeed, the facts of this case demonstrate that here at least the fiction is complete. They show that the journey of the coal from the Pennsylvania mines to Coalberg and the subsequent journeys upon leaving Coalberg were not parts of a "continuity of transit" in the sense held by this Court's previous decisions to preclude a valid exercise of the states' taxing or regulatory powers. See, *e. g., Pittsburg & Southern Coal Co.* v. *Bates,* 156 U. S. 577; *General Oil Co.* v. *Crain,* 209 U. S. 211; *Bacon* v. *Illinois, supra; Susquehanna Coal Co.* v. *South Amboy,* 228 U. S. 665.

A characteristic feature of those cases in which the state has been allowed to tax property which has come to rest after an interstate journey is that at the time the tax is laid it cannot be determined what the ultimate destination or use of the property may be. Thus in *General Oil Co.* v. *Crain, supra,* the oil was shipped to Memphis and held there until required to supply orders from out-of-state customers. In *Brown* v. *Houston,* 114 U. S. 622, coal sent from Pennsylvania to New Orleans was held taxable in Louisiana because, although some of it was subsequently exported, it "was being held for sale to anyone who might wish to buy." *Champlain Co.* v. *Brattleboro,* 260 U. S. 366, 376. In *Bacon* v. *Illinois, supra,* the grain sent to Bacon's elevator was at his complete disposal. "He might sell the grain in Illinois or forward it as he saw fit." Although his intention was to forward it after inspection, grading, etc., this purpose was held irrelevant. 227 U. S. at 516. And in *Susquehanna Coal Co.* v. *South Amboy, supra,* although there was an anticipation of or-

ders for the coal unloaded at South Amboy, yet there were no actual orders from customers. See also *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249; *Edelman* v. *Boeing Air Transport,* 289 U. S. 249.

Those cases are indistinguishable from this one as to the facts and the effect of the stoppage. Once the coal has reached Coalberg, no one can determine, without receiving an order from the owner, to what point or person it finally will be sent or to what use it will be put. Indeed, at the actual time of storage, even the owner may not know where the coal will go next, for the very purpose of the storage is in part to meet seasonal demand.[11]  And while

---

[11] It is to be noted however that the two-year period allowed by the tariff for storage, see note 8, is longer than is necessary to allow for meeting seasonal demand.

Storage-in-transit privileges are supplied, it is said, "as a result of traffic demands." A witness gave the following illustrations:

"(a) Coal is a commodity of seasonal consumption. Most of it is consumed in cold weather. If the mines could produce currently sufficient coal to meet cold weather requirements, the railroads would be swamped with coal traffic during the fall and winter months when other seasonal products are moving in large volume and weather conditions retard transportation operations. By spreading coal shipments for winter use over the months of most favorable operating conditions, a more uniform transportation revenue is assured.

"(b) Coal dealers and consumers ship it more uniformly throughout the year by using storage-in-transit privileges under railroad tariffs, and use negotiable warehouse receipts to finance their purchases where necessary.

"(c) The movement during warm weather of the bulk of the winter coal supply avoids car storage and releases cars more rapidly than if they arrived frozen solid, as they often do in winter, where delayed by bad weather or had to wait unloading and use at the place of consumption.

"(d) Experience has shown many instances, like those of recent occurrence, when a supply of stored coal close to the market areas has been necessary to prevent or relieve acute shortages of fuel in cases of labor, weather, or other interruptions in production or transportation.

"(e) A uniform movement of coal during favorable operating conditions, avoids the congestion, delay and increased expense which

the form of billing is not conclusive, *Minnesota* v. *Blasius, supra,* the fact that the coal is billed to Coalberg and is not rebilled until the owner asks that it be released from storage further shows that the final destination is not known by the owner or by others.

Moreover, in all these cases the duration of the cessation of transit is indefinite and in this case may extend as long as two years without loss of transit privilege. Indeed, except for that loss it may extend indefinitely, since under the controlling tariff Erie does not require, but only reserves the right to require, removal at the end of two years.[12] It is also significant that invariably the goods are fungibles, a fact pointing up the fictional basis of the in-transit privilege. The goods which are sent initially into the interstate commerce stream are not the identical goods which finally arrive at the place of consumption.

In view of all these considerations, the case falls more appropriately in the category allowing the state's taxing power to apply, than in the one denying its applicability. The interruption hardly can be held to be "due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement," *Minnesota* v. *Blasius,* 290 U. S. at 9–10, broad as may be the latitude given for such incidents of transit. More is involved here than stopping to take advantage of such latitudes. The case therefore is one, again in the language of the *Blasius* case, "where property has come to rest within a State, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the State,

otherwise attends rush and emergency transportation in winter weather.

"(f) Such storage-in-transit facilitates a more uniform and steady employment, not only of the miners but also of railroad employees, as well as a more uniform and steady railroad revenue."

[12] See note 8.

or for shipment elsewhere, as his interest dictates . . . ."
290 U. S. at 10.

The facts bring the case exactly within this description, although the record shows that most of the coal after storage goes to other states and little, if any, is distributed locally at Coalberg. Not what ultimately happens to the goods or where they finally go, but the occasion and purpose of the interruption are controlling. "The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied." *Minnesota* v. *Blasius,* 290 U. S. at 10.

Here the cessation takes place not simply for the carrier's transit reasons relating to the necessities or convenience of the journey, but for reasons primarily concerned with the owner's business interests. As in the *Bacon* and *Susquehanna Coal* cases, *supra,* he is entirely free to keep or market the goods in New Jersey or to send them elsewhere. Marketing considerations primarily, and it may be exclusively, determine this choice and many or all of the controlling factors may not arise until after the coal has reached Coalberg or indeed many months later.

The situation in this respect is not materially different from those involved in the *Susquehanna Coal, Bacon,* and other cases cited, or indeed from one in which a coal distributor might place his storage facilities at some distance from his place of market, as at a near-by way station, in order to reduce the cost of his storage operations. That reasons of economy and convenience or even of necessity arising from the absence or prohibitive cost of storage space at the immediate point of distribution might lead him thus to locate his storage operations, and thereby incur the necessity and expense of hauling the goods from storage to market, hardly could be held to make the inter-

ruption an incident of transit rather than one of his own business policy and interest. That he may secure the same advantages by using the storage facilities of others for like purposes, rather than his own, does not change the result. In neither case does the arrangement defeat the state's power to tax his property so located or his business thus conducted.

Moreover, as has been noted, some of the coal remains in New Jersey, being shipped out from Coalberg as the shipper directs. As to this all interstate transportation has ended. The fact that the owner elects to take advantage of Coalberg's storage facilities for conducting his storage operations rather than his own located at the point or points of final distribution in New Jersey, whether near to Coalberg or at some distance, does not make the final wholly intrastate movement between those points a leg of the initial interstate movement begun at the mine.

As for the coal moving out of Coalberg interstate, the fact that this movement crosses a state line makes it of course an interstate movement. But this does not make it part of a continuous journey beginning at the mine and ending in the second state of destination. Indeed, not until after the storage has taken place is it determined or can it be known whether this coal will move out of Coalberg interstate or intrastate. And this is because it cannot be known before that time whether the owner's interest, disconnected from the ordinary and usual incidents of transportation, will dictate one market or use rather than another. Interruptions thus governed cannot be classified as interruptions merely incident to transit or dictated by its necessities or convenience.

The 1939 change in Coalberg's mode of operation did not alter in any substantial way the character, duration or purpose of the stoppage. Since then as before, the primary reasons dictating the shippers' action in taking

advantage of it are their business reasons rather than transit reasons as such. Accordingly the state's power to tax the goods stored could not be affected by that change. That the state has chosen to discontinue exercising it as a matter of state taxing policy can make no difference in this respect. Nor can this fact, or the change in method of operation, defeat the state's power to tax the business of furnishing the facilities for storage, since that business also becomes local or interstate depending upon the purposes of the stoppage, whether for transit reasons or chiefly for nontransit ones.

The authorities above cited, it is true, generally involved property taxes levied upon the stored coal. But their controlling principle applies equally to franchise or other taxes upon the business of furnishing the storage facilities. Cf. *General Oil Co.* v. *Crain*, 209 U. S. 211; *American Steel & Wire Co.* v. *Speed*, 192 U. S. 500. It would be an impermissible anomaly to hold that the goods stored may be taxed, because the interruption of transit is for nontransit purposes, but that the business of furnishing the facilities for storing them is not affected or governed legally by the same purposes, for applying the state's powers of taxation.

Accordingly, the case is governed by the prior decisions allowing states and municipalities to tax in situations of this sort. It follows that the tax is not forbidden because it is part of a licensing measure. Even where it is undisputed that the commerce is exclusively interstate in nature, "not the mere fact or form of licensing, but what the license stands for by way of regulation is important." *Robertson* v. *California*, 328 U. S. 440, 458. See also *Union Brokerage Co.* v. *Jensen*, 322 U. S 202; *Federal Compress Co.* v. *McLean*, 291 U. S. 17. Nor does anything in the Interstate Commerce Act forbid local taxation where it is otherwise permissible. The tax therefore is valid under the commerce clause.

## III.

Whether the tax and the licensing measure as applied may stand under the Fourteenth Amendment also must be considered. Appellants say that the ordinance is discriminatory and unreasonable. Discrimination is claimed because the ordinance is applicable only to commercial warehouses and not to private warehouses and because there are no other commercial warehousing facilities in the Township subject to the tax. This contention is grounded on the provisions of New Jersey law, noted above, exempting property stored in commercial warehouses from taxation. It also is closely related to the further claim that the tax is prohibitory and unreasonable, and the two claims may be considered together.

> "It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation. . . . This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption, infringe no constitutional limitation." *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 509.

We need not consider in this connection the ultimate power of the state to tax,[13] for we are of opinion that neither the selection made here nor the amount of the tax is barred by the Fourteenth Amendment.

The New Jersey Court of Errors and Appeals has held that the present tax is not an illegal evasion of the state laws exempting personal property in commercial warehouses from property taxes, and that the municipality

---

[13] See the dissenting opinion of Mr. Justice Brandeis in *Liggett Co.* v. *Lee,* 288 U. S. at 570 ff.

was empowered by state law to levy this tax. Those rulings are conclusive upon us. Nor is it material to any question we have to decide that the practical result of the valid taxing power given the municipality enabled it to make up the loss in revenue suffered when Coalberg was transformed to a public facility.

Constitutionally speaking, the tax is not invalid as being unreasonably large for the privilege conferred.[14] It is not shown that the exaction is unrelated to the value of the privilege conferred and the Court of Errors and Appeals found to the contrary.[15] Private contractual arrangements, such as have been made here,[16] cannot be effective to defeat the state's power to impose such a tax, with the practical effect of relieving the real beneficiaries of the privilege from all taxation by virtue of their success in shunting its burden contractually to the nominal operator.[17] And the suggestion that the tax under the ordinance is prohibitive can carry no weight in view of the fact

---

[14] The tax, however, may be somewhat larger than the aggregate of the former personal property taxes. Personal property taxes paid prior to 1939 amounted to about $12,000 a year. Estimates of this tax given in the record vary from about that sum to around $20,000 a year. The variation corresponds to different estimates of the area, in terms of footage, constituting the base for calculation of the tax.

[15] See note 14. Cf. the dissenting opinion of Mr. Justice Brandeis in *Liggett Co.* v. *Lee,* 288 U. S. at 573, "The Federal Constitution does not require that taxes . . . be proportionate to the differences in benefits received by the taxpayers . . . or that taxes be proportionate to the taxpayer's ability to bear the burden."

[16] The record discloses that the present agreements between Independent Warehouses and the coal company are from year to year until terminated upon notice.

[17] Cf. *Browning* v. *Waycross,* 233 U. S. 16, 23; *Federal Compress Co.* v. *McLean,* 291 U. S. 17, 22: "It is not within the power of the parties, by the descriptive terms of their contract, to convert a local business into an interstate commerce business protected by the interstate commerce clause."

that substantially equal personal property taxes were paid prior to 1939.[18]

Appellants' other arguments may be given shorter disposition. The contention that Thompson's conviction is "unlawful" is answered by the decision of the New Jersey Court of Errors and Appeals which held that the municipality possesses the power which it exercised to convict persons working in unlicensed warehousing premises as well as to prohibit corporations and others from carrying on the business of warehousing without obtaining a license. Thompson was convicted not for his employer's act but for his own.

It is suggested also that the ordinance gives to the municipality an uncontrolled discretion to revoke the license and is therefore invalid for uncertainty, since it permits the Township Committee to "revoke any such license for sufficient cause after notice and hearing." Appellants have made no attempt to secure a license and therefore are not in position to attack the revocation provisions of the ordinance. Cf. *Bourjois, Inc.* v. *Chapman,* 301 U. S. 183, 188, and authorities cited.

Finally the ordinance is said to be invalid because of the provision for cumulative penalties.[19] The penal provisions however have not been imposed cumulatively in this case. Moreover the New Jersey Court has held them separable,[20] if illegal. In such circumstances, the objec-

---

[18] See note 14.

[19] The ordinance makes each day's continuance of violation a separate offense.

[20] The New Jersey Court of Errors and Appeals stated: "The ordinance contains a provision that in case 'any section or part' thereof shall be held illegal or unconstitutional, such invalidity 'shall not be construed as impairing the force and effect of the remainder of the ordinance.' If it be conceded *arguendo* that the cumulative penalty clause is invalid in whole or in part, the remainder of the provision for sanctions is severable and would stand unaffected. 134 N. J. L. at 144.

tion that the mere unapplied provision for cumulation violates the Fourteenth Amendment is without substance. *Louisville & N. R. Co.* v. *Garrett,* 231 U. S. 298, 311, and authorities cited.

The judgment is

*Affirmed.*

Mr. Justice Frankfurter, concurring.

The dissenting views lead me to add a few words to the Court's opinion, in which I join.

Nearly thirty-five years ago Mr. Justice Holmes observed that "one in my place sees how often a local policy prevails with those who are not trained to national views and how often action is taken that embodies what the Commerce Clause was meant to end." (Holmes, Speeches, Law and the Court, 98, 102). His concern has not lost force with time, and it is important to be duly mindful of it whenever a State claims the power to tax in a situation like that now before us.

Equally relevant are other observations by Mr. Justice Holmes regarding this problem. "It being once admitted, as of course it must be, that not every law that affects commerce among the States is a regulation of it in a constitutional sense, nice distinctions are to be expected. Regulation and commerce among the States both are practical rather than technical conceptions, and, naturally, their limits must be fixed by practical lines." *Galveston, Harrisburg, etc. R. Co.* v. *Texas,* 210 U. S. 217, 225. And so, this Court has sustained a tax upon the mining of ore although substantially all the ore left the State and was put upon cars for that purpose by the same act by which it was produced. *Oliver Iron Co.* v. *Lord,* 262 U. S. 172. Mr. Justice Holmes joined in that opinion although "There could not be a case of a State's product more certainly destined to interstate commerce." Holmes, J., dissenting in *Pennsylvania* v. *West Virginia,* 262 U. S.

553, 600, 601. Again, the Court has held that a State may impose a non-discriminatory tax on goods which, although connected "as a general course of business" with "a flow of interstate commerce," "has come to rest and has acquired a situs within the State" at "a depot . . . for another interstate journey." *Minnesota* v. *Blasius,* 290 U. S. 1, 8, 11. For the practical purposes which determine the constitutional issue there can be no difference between taxing such goods as property and taxing the business of being a depot for such goods. In striking the constitutional balance between State and national powers, figures of speech are treacherous. The ore which Minnesota was allowed to tax in the *Lord* case, and the cattle which Minnesota was allowed to tax in the *Blasius* case, were in no practical sense less in the "flow of commerce" than the coal the storage of which was the business subjected to a non-discriminatory license tax by New Jersey.

Nor can it make a difference that this storage business was conducted by a concern controlled by the coal-carrying road. If a wholly independent storage concern would have had to pay a license tax, the controlling constitutional principles require no different result because the storage facility is a subsidiary of a railroad. Presumably there are good business reasons for the use of such a subsidiary corporation. Compare *Edwards* v. *Chile Copper Co.,* 270 U. S. 452, 456. Those reasons are equally valid for the State's taxing purposes. It cannot be said that New Jersey has given no opportunities, has afforded no protection, and has conferred no benefits upon Independent Warehouses, Inc., merely because in an ultimate sense there is a financial identification between Independent Warehouses and the Erie Railroad. Compare *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444. If what was here involved were merely an occasional and transient storage

of coal moving from Pennsylvania to New York, New Jersey could not levy a property tax on the coal nor a license tax for the storing of it. The controlling consideration here is that there was storage of the coal precisely like the holding of the cattle in the *Blasius* case. In both cases there was a sufficiently distinct and permanent break in the process of transportation between the States so as to give rise to interests in the State of storage to justify the exertion of its non-discriminatory taxing power. For me this case is controlled by *Susquehanna Coal Co.* v. *South Amboy,* 228 U. S. 665. Here, as in that case, there was something more "than an incidental interruption of the continuity" of the coal's "journey through the State." There was "a business purpose and advantage in the delay which was availed of, and while it was availed of, the products secured the protection of the State." 228 U. S. at 668 and 669. Thereby the State's power to tax arose.

The fact that for railroad-rate purposes this storage was treated as part of a transit privilege does not affect the relation of the storage to the taxing powers of the State. Assuming that such a storage may properly be treated as a stop-over privilege under the Interstate Commerce Act, it does not follow that the break in the process of interstate transportation is not of such significance in its relation to a State as to allow that State to tax the protection given to the property during the break as well as the opportunity afforded in conducting the business for such separable and enduring storage in the State.

MR. JUSTICE JACKSON, with whom THE CHIEF JUSTICE joins, dissenting.

The Erie Railroad Company is a common carrier engaged in interstate commerce. By a specific tariff filed with the Interstate Commerce Commission pursuant to the Interstate Commerce Act, it and several other rail

carriers have long published a joint and proportional through-tariff on anthracite coal from coal mining stations in Pennsylvania to points in New York and New Jersey. The tariff provides for storage-in-transit services at Coalberg, New Jersey, with reshipment to destination under original agreements. Independent Warehouses, Inc., as contract agent for the Erie, operates these storage-in-transit facilities, has custody of the coal in storage under Erie tariffs as a public warehouseman, and issues warehouse receipts for coal received under railroad waybills. Title to Coalberg is in the Pennsylvania Coal Co., a wholly-owned subsidiary of Erie, and it receives from Independent Warehouses one dollar per year for its lease. The Erie ultimately bears all losses and gets all gains. It is apparent that Coalberg is a facility for storage in transit of coal operated as part of the Erie's interstate transportation service.

The function of the storage in transit is vital. During the summer season, consumption of anthracite coal is light and neither dealers nor consumers in the City of New York and elsewhere are able to store adequate winter reserves. At critical times there would be grave danger of inadequate fuel supplies from interruptions of transportation or of mining operations if stock piles were not accumulated near consuming centers, such as New York, to be drawn upon in periods of peak demand. Therefore, the railroad accepts coal shipments which it mingles in stock piles at Coalberg, near New York, with the privilege to the shipper of ordering the same grade and quantity sent on to destination as needed. When orders for reshipment come, they are drawn from stock piles and delivered. Storage-in-transit is a device to equalize the demands on coal transportation facilities and to provide a reserve supply of coal for periods when consumption exceeds production, to enable movement away from the mines during the

period when production exceeds consumption, and to finance future purchases by warehouse receipts issued against coal in transit. It is an essential part of dependable and low-cost transportation of anthracite coal from the mines to the great metropolitan consuming area.

For the privilege of operating this storage-in-transit facility at Coalberg in New Jersey, the municipality demands an annual license fee, in advance, which it is alleged would amount to $20,475. This is merely for the privilege of doing the business. The property used in the operation is also subject to the usual property tax on a valuation of $133,875, which is not in question.

The issue is whether this local privilege tax unconstitutionally burdens interstate commerce. The burden and its substantiality are undeniable, but the Court concludes that these local assessments upon interstate traffic are within the power of the state and, of course, the amount, be it $20,000 per year or $20,000,000 per year, is wholly for the local authorities to determine if their power to tax is upheld.

I cannot agree that the commerce clause of the Federal Constitution has left interstate traffic vulnerable to such local permissions and burdens. Because the immediate impact of the tax is on a railroad, we should not delude ourselves as to its real effect. It is a tax on traffic—on the movement of goods—and its weight is shifted from the carrier to the consumer. There is, of course, a "local incident," a stoppage in transit, a reloading. "Local incidents" of some sort can be identified in all interstate transportation. But in this case local sales or deliveries are insubstantial in amount. The whole operation is incidental to interstate transportation and not to any local business. It is integrated in operation, ownership and management with transportation. It is under the federal commerce power and under Interstate Commerce Commis-

sion regulation. The stoppage may be longer than many other stoppages in transit incident to railroading. But the storage of perpetually renewed and continuously drawn-upon stock piles is no longer than necessary to adapt transportation facilities to the needs of an economy, one end of which must engage in continuous production and the other in only seasonal consumption. That a single municipality or state can fasten local tax burdens upon such an incident makes interstate commerce vulnerable to the very barriers and obstructions the commerce clause of the Constitution was designed to end.

The unedifying story of Colonial rivalry in preying upon commerce, which more than any one thing made our Federal Constitution a necessity, is too often told by historians to justify repetition. This tax is reminiscent, however, of some phases of that commercial warfare. In 1787 New York was being supplied with firewood from Connecticut and much farm produce from New Jersey. It seized upon "local incidents" to lay a tax. Every sloop which came down through Hell Gate, every cart of firewood entering the city, and every market boat rowed across the Hudson River had to pay heavy entrance duties. Then came retaliatory measures. See Fiske, *The Critical Period of American History,* Chap. IV. These chronic quarrels were destroying the trade of all the rivals, and it was sought by the Constitution to free trade from local burdens and controls.

This New Jersey tax on transportation of New York's coal supply is more dangerous in the end than the old New York tax on its own firewood. In that case the consumers who ultimately would pay the tax also controlled the government which shortsightedly laid the tax. It was a tariff, and the tariff-ridden people could remove it.

But here the ultimate burden of the tax falls on consumers of New York and elsewhere who have no repre-

sentation in the government which lays the tax and fixes its amount. The authorities who fix the tax will never have to answer to those who pay it. That is the evil of "taxation without representation." Here is a tax that falls immediately upon a single taxpayer, for it does not appear that any other is similarly affected. It is a tax that falls ultimately on non-residents of the taxing authority. If it is valid, I know of no reason why the community should bear any of its own tax burdens. This is the great vice of these local burdens on interstate movement of goods. If this is not the sort of burden and barrier to a nation's free trade that our commerce clause was designed to end, I should think one would be hard put to find an example. This decision represents a trend that seems to me quite out of the spirit of our history and quite as detrimental to our commercial welfare and unity. See my concurring opinion, *Duckworth* v. *Arkansas,* 314 U. S. 390, 397. I am not unaware of the needs of this locality, as of all others, for revenue. But it seems to me that the activities at Coalberg are as fully in the current of interstate commerce as those we held immune from state taxation in *Freeman* v. *Hewit,* 329 U. S. 249, and *Joseph* v. *Carter & Weekes Stevedoring Co.,* 330 U. S. 422. The storage-in-transit service is as essential to maintaining and as much a part of the flow of coal as loading and unloading of goods shipped in interstate commerce is of that commerce. The Constitution laid restraints upon each locality lest their local advantages be pursued at the cost of the commerce on which the prosperity of all depends. I would reverse the judgment.