GARDEN STATE RACING ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. CHERRY HILL TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued February 17, 1964—Decided June 22, 1964.

*Mr. Samuel P. Orlando* argued the cause for plaintiff-appellant.

*Mr. Warren C. Douglas* argued the cause for defendant-respondent.

The opinion of the court was delivered by

SCHETTINO, J. Plaintiff, the Garden State Racing Association, sought to enjoin defendant, Cherry Hill Township, from enforcing an ordinance which provides for the licensing of parking lots, and to have the ordinance declared invalid, at least as applied to plaintiff. The trial court upheld the ordinance and refused plaintiff's requests for relief. We certified plaintiff's appeal on our own motion before argument in the Appellate Division. *R. R.* 1:10–1(a).

Plaintiff holds a horse racing permit under *N. J. S. A.* 5:5–22 *et seq.,* and has operated a track in Cherry Hill Township for more than 20 years. In spacious lots adjacent to the track, plaintiff provides parking facilities at charges of $.50 to $1.50 per car. The parking fee is in addition to the charge for entrance to the track itself. The parking areas are located outside the entrance gates to the racetrack proper where the admission fees are collected.

In the vicinity of the track, others are also in the business of providing parking facilities for a fee. Plaintiff also owns and operates a large hotel-restaurant within a short distance from the track.

In 1942 the defendant township adopted a parking lot ordinance establishing annual license fees which ranged from $1 to $100 depending on the capacity of each individual parking lot. Plaintiff fell into the $100 category and apparently paid the annual fee from 1942 through 1962 without complaint.

On April 23, 1962 the township adopted another parking lot licensing ordinance, No. 327, which imposed annual fees of $10 to $100 depending on lot capacity, plus an additional five cents for each vehicle parked. The only regulatory portion of the ordinance provided:

"Each applicant for a license hereunder shall submit to the Township Chief of Police a scale plan of the property to be licensed showing the number and location of each parking space and the entrance and exit locations. The Chief of Police * * * shall * * * forward the plan to the Township Clerk with his approval unless the plan presents a hazard to the walking or driving public, a hazard to

the occupants or any facilities on the property, or undue hindrance to passage of emergency or fire equipment. The plan shall remain on file with the Township Clerk during the term of the license and no vehicles shall be parked except in accordance therewith."

After the passage of this ordinance, plaintiff brought the present action; initially obtaining a temporary restraining order against the township, and later a restraining order pending final disposition. Both parties then brought cross motions for summary judgment which were denied by the Chancery Division. In denying the motions the trial court expressed doubt as to whether the ordinance was valid in that there appeared to be no correlation between the cost of regulation and the amount of money to be realized from the license fees. However, the court permitted the pleadings to be amended in order that the issue would be properly before it. Plaintiff thereafter amended its complaint to embody the trial court's suggestion that there was no reasonable relationship between the amount of the license fee and the costs of regulation. Before trial, however, defendant township adopted an amendatory ordinance, No. 356, which added the following regulatory measures to those quoted above:

"(a) All licensees shall have a sufficient number of guards or attendants on duty to control all entrances or exits at all times during which vehicles are parked, for the purpose of limiting the improper removal of vehicles and directing the traffic flow, unless at each entrance * * * notice is prominently displayed * * * that the facility will be unattended during certain specified hours. (b) All licensees * * * [operating] during the usual hours of darkness shall provide adequately lighted pedestrian walkways * * * for the safety of patrons. (c) All licensees who operate parking lots shall maintain the same except for the period of six hours after * * * any snowfall, in such a manner that the * * * surface shall be smooth, rut free and sufficiently hard surfaced that no vehicles shall become mired or stuck. (d) All licensees shall * * * keep on file with the Clerk * * * certificate evidencing the licensee's procurement of public liability and property damage insurance with minimum coverage of $100,000 for each person and $300,000 for each accident."

In the pretrial order and at trial, the court treated this ordinance in conjunction with No. 327, for the purpose of

determining whether there were sufficient regulatory features to sustain municipal licensing fees in question.

At trial, the following evidence was adduced. The parties agreed by stipulation that plaintiff's parking lots would accommodate a norm of 400,000 cars during the 50 days of racing per year, and that revenues under the ordinance from the plaintiff would thus amount to about $20,000 annually. The township's commissioner of revenue and finance testified that the ordinances were adopted for regulatory and revenue purposes. He indicated that several of the commercial parking lots in the township, some racetrack connected and some not, had previously caused traffic problems because of lack of supervision. He specifically alluded to two instances involving non-track parking lots. The witness testified that he and the other two township commissioners had liberally estimated $10,000 to represent the cost of enforcing the ordinances. This figure included six or seven thousand dollars for "inspection of the lots, supervision of the lots and the additional employees necessary to handle the traffic in and out of the lots," and three or four thousand dollars for "miscellaneous expense, insurance costs and the administration and the collection of the monies." The commissioner also indicated that the department of public works had submitted an additional estimate of $5,000 representing the costs of repairs and maintenance caused by the traffic from plaintiff's lots. Defendant's superintendent of public works testified that the heavy flow of cars and buses during the racing season took a heavy toll on the township's roads, requiring added repairs. He emphasized that the roads were constructed principally of "oil and chips," a composition which, unlike asphalt, is suited for only light residential traffic. He also estimated that the men and equipment required for general maintenance, cleaning and the application of sodium chloride for dust control were about 75 percent higher during the ten weeks of the racing season than at any time during the balance of the year.

A police lieutenant in defendant township testified that the racetrack season and resultant traffic necessitated the posting

by his department of emergency no parking signs and cones on the township streets in the vicinity of the racetrack. Defendant offered to call its engineer for the purpose of showing the cost of restoring roads damaged by racetrack traffic, but the court indicated it was not interested in that type of testimony.

Finally, there was evidence that the five cent fee per automobile was arrived at through reference to the hourly charge for metered parking in nearby communities, "which is also for the basis of regulation and the ensuing revenue that can come from it."

At the conclusion of the trial, the trial court held that the original ordinance, No. 327, as amended by the regulatory provisions of No. 356, was proper both as a regulatory and "revenue-raising" measure. He also concluded that whether the fees were excessive in relation to the costs of regulation was incapable of determination at that time as they could not be validly estimated until the ordinances had been in effect for some period of time.

I.

Plaintiff initially contends that the township's licensing fees as applied to the parking facilities at the racetrack are forbidden by *N. J. S. A.* 5:5–66. This section of the act regulating horse racing deals principally with defining that percentage of the pari-mutuel pools which are payable as taxes to the State through the New Jersey Racing Commission. At the time the amended ordinance of defendant was adopted the last sentence of *N. J. S. A.* 5:5–66 provided:

"No admission or amusement tax, excise tax, license or horse racing fee of any kind, except as expressly provided in this act, shall be assessed or collected from any permit holder by the State * * * or by any county or municipality, or by any other body * * *."

This sentence was amended by *L.* 1963, *c.* 35, § 4 to read:

"Except as otherwise provided by law, no admission or amusement tax, excise tax, license or horse racing fee of any kind shall be

assessed or collected from any permit holder by the State * * *, or by any county or municipality, or by any other body * * *."

Although the meaning may have been changed by the substitution, the new language makes no difference here.

At the outset it is obvious that if the language of this provision were literally applied, a permit holder would be exempt from license fees in any business he carried on in the State, whether or not connected with the horse racing enterprise. Plaintiff does not urge such an interpretation.

Rather, plaintiff's argument seems to be that *N. J. S. A.* 5:5–66 bars these parking lot license fees because its parking business is a necessary adjunct to its operation of the racetrack. There is no dispute that the parking lots are necessary accessories to plaintiff's primary business of running a racetrack. But it does not follow as contended by plaintiff that the Legislature intended to preclude a licensing fee as here involved simply because the business of the permit holder affected by the licensing ordinance happens to be run in conjunction with the business allowed by the permit. It might simply be noted here that this subsidiary business of parking grossed plaintiff $261,754.50 during the 50-day 1961 season.

The sounder view and the one we adopt is that the clause in question was intended by the Legislature to prohibit local taxation with respect to those revenues flowing directly from the horse racing. Under *N. J. S. A.* 5:5–22 *et seq.* the State has limited its imposition of taxes to the actual horse racing and betting thereon. A reading of *N. J. S. A.* 5:5–66 in its entirety reveals that the relevant prohibitory portion appends the general provision establishing the tax and applicable percentages on the pari-mutuel pool. Thus, we conclude that the Legislature intended only to exempt from parallel taxation the essential aspects of racing and betting, and that local regulation of mere ancillary activities such as parking is outside the State's exclusive domain and not prohibited by the act. In addition to *N. J. S. A.* 5:5–66, see *N. J. S. A.* 5:5–64 (breakage); *N. J. S. A.* 5:5–81 and 82 (special permits).

## II.

■■ There is no question that a municipality could regulate parking lots under the general police power enactment, *R. S.* 40:48–2. While this statute does not necessarily preclude the imposition of a license fee, such fee may not be imposed for revenue purposes. *Moyant v. Paramus,* 30 *N. J.* 528, 546 (1959). On the other hand, *N. J. S. A.* 40:52–1 names certain specific subjects which the municipality may license and regulate, and its correlative section, *R. S.* 40:52–2, provides that fees for such licenses may be imposed for revenue. We note that Mr. Justice Jacobs in *Salomon v. Jersey City,* 12 *N. J.* 379, 390 (1953), stated that although the overriding legislative purpose of these two sections was to license and regulate as police measures there was an incidental purpose, namely, "for revenue which may, at least within reasonable limits, exceed the regulatory costs."

Defendant admits that its parking lot licensing ordinance has a revenue-raising as well as a regulatory purpose. Thus, if the revenue features of the ordinance are to be upheld, parking lots must come within one of the subjects listed in *N. J. S. A.* 40:52–1. Defendant contends that its ordinance finds statutory authority under paragraph (e)'s inclusion of "automobile garages" as one of the specific objects which a municipality may license and regulate by ordinance under 40:52–1. While the question of whether "automobile garages" would include parking lots under this enactment is a question not previously before this Court, other specific subjects have been considered in our decisions. In *Edwards v. Mayor, etc., Borough of Moonachie,* 3 *N. J.* 17, 23, "trailer camps" and "camp sites" were held to be included under subsection (d)'s "Hotels, boarding houses, lodging and rooming houses, and all other places and buildings used for sleeping and lodging purposes." In the *Moonachie* case after the adoption of the ordinance and before the case was decided by this Court, the Legislature specifically included "trailer camps" and "camp sites" under paragraph (d). However, we were

concerned only with the act in effect when the ordinance was adopted, and held that it was "not open to doubt" that trailer camps and camp sites comprised "places" used for "sleeping and lodging purposes." We merely noted that the amendment was intended to clarify the meaning of the original terms rather than grant additional authority to the municipality. And in *Brielle v. Ziegler*, 73 *N. J. Super.* 352, 356–357 (*Cty. Ct.* 1962), a boat was held to be encompassed by the language under paragraph (a)—"all vehicles used for transportation of passengers." On the other hand, in *Moyant, supra* (30 *N. J.*, at *p* 543), we held that terms under subsection (c), "hawkers," "peddlers," and "itinerant vendors," did not include "solicitors" and "canvassers" because "all of these categories have distinct and well-understood meanings." It was also suggested in *Moyant* that solicitors and canvassers might have been omitted under the act purposefully since the business of such persons is generally interstate in character. (30 *N. J.*, at *pp.* 543–44.) Other cases have construed the general language under subsection (g) of the act—"and all other kinds of business * * *." See, *e. g., Independent Warehouses, Inc. v. Scheele*, 134 *N. J. L.* 133, 142 (*E. & A.* 1945), affirmed 331 *U. S.* 70, 91 *L. Ed.* 1346, 67 *S. Ct.* 1062 (1946) (warehousing held encompassed); *City of Absecon v. Vettese*, 13 *N. J.* 581 (1953) (local newspaper held not included); *General Roofing Co. v. Belmar*, 77 *N. J. Super.* 469 (*App. Div.* 1962) (roofing contractor held not included).

However, none of these cases affords any real assistance in answering the particular question of whether the statutory term "automobile garages" encompasses parking lots. *City of Newark v. Marlin*, 22 *N. J. Super.* 32 (*App. Div.* 1952), reversed on other grounds, *sub nomine, City of Newark v. Pulverman*, 12 *N. J.* 105 (1953), was concerned with an ordinance's definition of "garage" which clearly included parking lots. Nevertheless, Judge Goldmann felt inclined to comment on the general definition of the term by way of *dictum* (22 *N. J. Super.*, at *pp.* 35–36) :

" 'Garage' does not have the restricted meaning which the defendant would assign to it, of a building or structure for the storing of automobiles. The word is not a static or dormant concept, but dynamic, like any other word which has found its place in modern usage. Adopted into the English language from the French, the meaning of 'garage' has expanded with the years. It is not, in the dated language of *Smith v. O'Brien*, 46 *Misc.* 325, 94 *N. Y. S.* 673, 674 (*Sup. Ct.* 1905), 'the modern substitute of the ancient livery stable,' or, as was said in *Beach v. Jenkins*, 174 *App. Div.* 813, 159 *N. Y. S.* 652, 657 (*App. Div.* 1916), 'a stable for motor cars.' Such definitions are more appropriate to an era when relatively few owned a 'horseless buggy' than to the motor age of the mid-20th Century when automobiles are owned by millions and have become a symbol as well as a major problem of our society."

In *City of Chicago v. Ben Alpert, Inc.*, 368 *Ill.* 282, 286, 13 *N. E. 2d* 987, 989 (*Sup. Ct.* 1938), an Illinois statute empowering cities to regulate "garages" was held to permit municipal licensing of an open air parking lot. The court held that the city's sphere of regulation under the act was not restricted to such "premises as may have conformed to the accepted popular definition of the word 'garage' in 1911, when it was incorporated in the statute," reasoning that: "Conditions attending the storage and parking of automobiles in metropolitan areas today are vastly different from those prevailing a quarter of a century ago when the state empowered cities to regulate and license garages."

It has been close to 50 years since the category of "automobile garages" was added to the original list of subjects under *N. J. S. A.* 40:52–1 (originally *L.* 1917, *c.* 152, *Art.* XV, § 1, *p.* 358) by *L.* 1918, *c.* 252, § 1, *p.* 958. In 1918 the modern day parking lot was virtually unknown. The open air parking lot presents substantially the same problems of traffic control to the municipality as does the enclosed public garage. Both the public garage and open air lot provide parking for a fee. We conclude that "parking lots" are encompassed by the statutory class of "automobile garages."

### III.

Plaintiff contends that the ordinance is *ultra vires* and invalid, claiming its primary purpose is revenue-raising

rather than regulation, citing *Salomon, supra.* Initially, there is a presumption of reasonableness as to the license fee imposed by the ordinance, and the burden of proving otherwise rests on the attacker. *Moyant, supra,* 30 *N. J.,* at *p.* 547. Moreover, unlike the Jersey City tax in *Salomon,* this ordinance is not "purely a taxing measure without any regulatory aspects whatever." (12 *N. J.,* at *p.* 385) As noted above, the expected revenue from plaintiff was stipulated to be about $20,000 per year. An estimate of $10,000 was given by defendant as to the ordinances' cost of enforcement, its public works department submitted a figure of $5,000 as representing the additional maintenance and repair costs occasioned by the racetrack traffic and the police lieutenant testified to additional work and supervision resulting from the added heavy racetrack traffic. Therefore, it cannot be said that the $20,000 bears an unreasonable relation to the impact of the operation upon the community including the costs of the enforcement of the ordinances. See *Bellington v. East Windsor Township,* 17 *N. J.* 558, 566–567 (1955). Plaintiff has not proved that the surplus of revenue over costs is so great as to invalidate the ordinances. See *Salomon,* 12 *N. J.,* at *p.* 390, and *Moyant,* 30 *N. J.,* at *p.* 547.

As the trial court pointed out, the costs of regulation are merely speculative at the present time, and any accurate measure of the relationship between revenue and costs will have to await the ordinances' actual enforcement. *Cf. Flynn v. Horst,* 356 *Pa.* 20, 51 *A. 2d* 54 (*Sup. Ct.* 1947); Note, Miller, "A Re-Evaluation of Judicial Criteria for Determining the Reasonableness of Municipal License Fees." 11 *Rutgers L. Rev.* 703, 708 (1957).

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For reversal*—HALL—1.