INDEPENDENT WAREHOUSES, INC., PENNSYLVANIA COAL COMPANY, AND ERIE RAILROAD COMPANY, PROSECUTORS-RESPONDENTS, v. WILLIAM SCHEELE, RECORDER OF THE TOWNSHIP OF SADDLE RIVER, AND TOWNSHIP OF SADDLE RIVER, IN THE COUNTY OF BERGEN, DEFENDANTS-APPELLANTS.

JAMES THOMPSON, PROSECUTOR-RESPONDENT, v. WILLIAM SCHEELE, RECORDER OF THE TOWNSHIP OF SADDLE RIVER, AND TOWNSHIP OF SADDLE RIVER, IN THE COUNTY OF BERGEN, DEFENDANTS-APPELLANTS.

Argued October 16, 1945—Decided January 31, 1946.

For the appellants, *Chandless, Weller & Kramer* (*Ralph W. Chandless,* of counsel).

For the respondents Independent Warehouses, Inc., and James Thompson, *Collins & Corbin.*

For the respondents Pennsylvania Coal Company and Erie Railroad Company, *Hobart, Minard & Cooper* (*Robert J. Bain, Duane E. Minard* and *G. Addison Hobart,* of counsel).

The opinion of the court was delivered by

Heher, J. The challenged ordinance provides for the licensing of "the business of the storage of personal property in a warehouse engaged in storing goods for hire," and "the place of premises" in which such business "is conducted or carried on," and levies, admittedly as a revenue measure, an "annual fee" to be computed "on the basis or rate of three-quarters of a cent for each square foot of the total ground area of the place and premises" devoted to the business; and it is the insistence of respondents that, since this bylaw lays the license fee upon the "place or premises" in which the storage business is carried on, "measured by land areas," it is, in effect, an additional tax "upon the property," and that, at all events, it is in substance a tax laid upon the stored coal "in lieu of personal property taxes" that would be leviable thereon were it not for the exemption granted by *R. S.* 54:4–3.20, and thus a negation of that legislative policy. If "perishable goods" are stored upon the licensed premises, the licensee is under a duty to comply with all health regulations "required by any federal, state or municipal authority." He is also enjoined to observe all police and fire regulations laid down by the local "police and fire authorities." And there is provision for inspection of the premises by the local police. fire and health authorities, and a requirement that the storage of "any inflammable or combustible matter" thereon shall be immediately reported to the governing body. Respondents' business is within the exemption category. *Pattison & Bowns, Inc.,* v. *Township of Saddle River,* 129 *N. J. L.* 135; *affirmed,* 130 *Id.* 177. We find these points to be devoid of substance.

The ordinance was enacted in the purported exercise of the power conferred by *R. S.* 40:52–1 (g) and 40:52–2; and these provisions and section 54:4–3.20, *supra,* are mutually exclusive. The former involves a license or privilege tax or excise levied for both revenue and regulation under the police power, while the latter section has reference to a property tax merely. The levies may coexist, if such be the legislative intention; and this is the case here. Section 54:4–3.20 plainly confines the exemption to property taxes, *i. e.,* "per-

sonal property stored in a warehouse" of one "engaged in the business of storing goods for hire."

License is a means of regulating and taxing privileges and occupations and the use and disposal of property. The exactions thereby made do not take the category of an *ad valorem* property tax. License and property taxes cover separate and distinct areas of the local taxing power; and they have radically different attributes. *Jersey City* v. *Martin,* 126 *N. J. L.* 353. See, also, *Bowman* v. *Continental Oil Co.,* 256 *U. S.* 642; 41 *S. Ct.* 606; 65 *L. Ed.* 1139. The one is a tax upon the business of the warehouseman; the other is a direct tax upon the property of third persons stored in the warehouse. And the exercise of the latter power is confined by specific constitutional limitations which do not apply to the former. There is no suggestion of a legislative purpose to render the storage and warehouse business immune from the tax for revenue and regulation permissible under the cited licensing statute. The frame of the statutes is not consistent with the theory of an all-inclusive exemption from taxes of both classes. The contention *contra* necessarily proceeds upon the hypothesis that, prior to the adoption of the exemption statute, the *ad valorem* property tax was exclusive of all license taxes and excises; and this proposition is obviously untenable. The argument of competitive disadvantage is one to be addressed to the legislative forum.

But the exercise of the licensing power cannot exceed the bounds of reason. The law will not suffer confiscation and oppression under the guise of taxation. The *quantum* of the tax rests in sound discretion, guided by reason; and judicial intervention is justifiable only where there has been an abuse of the power. If the local legislative action is not clearly unreasonable or unduly oppressive or discriminatory, its policy is not a justiciable question. *The Great Atlantic and Pacific Tea Co., Inc.,* v. *Camden,* 122 *N. J. L.* 47; *Giant Tiger Corp.* v. *Camden,* 122 *Id.* 240; *American Grocery Co.* v. *Board of Commissioners of New Brunswick,* 124 *Id.* 293; *Gurland* v. *Kearney,* 128 *Id.* 22.

And we are clear that the taxes thus levied do not constitute a direct and undue burden upon and therefore a regula-

tion of interstate commerce in contravention of article I, section VIII, cl. 3 of the Federal Constitution.

The regulation of foreign and interstate commerce is a subject within the exclusive jurisdiction of the Congress. This control embraces all the instrumentalities by which such commerce may be carried on. And, while a state possesses the power to tax property having a *situs* within its confines, whether employed in interstate commerce or not, it cannot impose a tax for the privilege of engaging in such commerce. *Helson and Randolph* v. *Kentucky,* 279 *U. S.* 245; 49 *S. Ct.* 279; 73 *L. Ed.* 683; *Sprout* v. *South Bend,* 277 *U. S.* 163; 48 *S. Ct.* 502; 72 *L. Ed.* 833; *McCall* v. *California,* 136 *U. S.* 104; 10 *S. Ct.* 881; 34 *L. Ed.* 391. But a tax for the privilege of exercising a corporate franchise within the state is not obnoxious to the commerce clause. A tax measured by net profits earned within the state is valid, even though these profits may have been derived in part, or indeed mainly, from interstate commerce. A franchise is deemed a part of the corporate property lawfully taxable in the state. *Underwood Typewriter Co.* v. *Chamberlain,* 254 *U. S.* 113; 41 *S. Ct.* 45; 65 *L. Ed.* 165; *United States Glue Co.* v. *Oak Creek,* 247 *U. S.* 321; 38 *S. Ct.* 499; 62 *L. Ed.* 1135; *Northwestern Mutual Life Insurance Co.* v. *Wisconsin,* 247 *U. S.* 132; 38 *S. Ct.* 444; 62 *L. Ed.* 1025. The tax levy here is not of the proscribed class.

The essential facts are not in dispute. The storage plant, commonly known as "Coalberg," is owned by the Pennsylvania Coal Company, a Pennsylvania corporation. It comprises 67¼ acres of land and buildings, tracks, chutes, hoppers, scales, machinery and equipment. The owner leased the yard in its entirety to Independent Warehouses, Inc., a New York corporation, at the nominal annual rental of $1. These corporations are wholly owned subsidiaries of the Erie Railroad Company, a common carrier in interstate commerce; and under agreements between these parties, the plant is operated by the Pennsylvania Company "for the benefit and on behalf of," and at the sole expense of the Erie Company's trustees, "as a public service facility for shippers of prepared anthracite coal on Erie lines desiring storage space

in accordance with and under the rates named in a certain tariff on file with the Interstate Commerce Commission and the Public Utilities Commission of the State of New Jersey, issued January 24th, 1939," and any supplements thereto. The Erie's trustees agreed to maintain an agent at the yard authorized on their behalf to issue warehouse receipts for coal placed therein "for storage by shippers." The Pennsylvania Company undertook to remit to the trustees, monthly, the net operating surplus; and the trustees assumed the obligation of reimbursement for the net operating loss, if any. By express provision, "taxes" are includable in the "allowable items of expense chargeable against" operation and maintenance. By this arrangement, the Erie's trustees sought to avert the diversion of "shipments of coal * * * to other and competing lines on which facilities for coal storage are available."

The agreement with Independent Warehouses, Inc., recites that it was "the desire and for the interest" of the Pennsylvania Company that the lessee should conduct upon the premises the "general business of a warehouseman," and provides that the lessee shall devote the yard to such purposes, and shall furnish storage therein for "any and all types of coal * * * tendered to it for warehousing for the account or at the request of" the Pennsylvania Company (if there shall be available storage space) at the rate of two cents per ton, with a minimum annual charge of $600. There was also a provision for reimbursement of the lessee for its losses, costs and expenses not classable as "ordinary." By a supplemental agreement, the storage rate was reduced to one-half cent per ton, and the annual minimum charge to $500. The New York, Susquehanna and Western Railroad Company has certain contractual trackage rights at the yard, and the use of other facilities. Independent Warehouses, Inc., is engaged in the public warehouse business "at various places in nine states." For some fifteen years prior to the agreement with the Pennsylvania Company, Independent had issued warehouse receipts for coal stored in this yard.

The Pennsylvania Company owns and operates anthracite coal mines in the State of Pennsylvania. Coal sold at the

mines is, by contract with the purchaser, shipped in inter-state commerce over the railroad of the Erie Company, and stored at the Coalberg yard until, at the shipper's direction, it is again conveyed by rail to its ultimate destination. For the in-transit storage, including unloading, reloading, and the incidental services, the shipper pays to the carrier a tariff charge of 28 cents per ton. Free storage is permissible for as long as two years. This storage is designed to meet seasonal deficiencies and shortages due to the excess of consumption over production, and to facilitate the financing of purchases through negotiable warehouse receipts, all of which, it is said, advance the general welfare as well as serve the particular interests of the mine operators, shippers and carriers. Erie's coal freight agent testified that, when because of seasonal conditions the supply exceeds the demand, "the operators bill" coal "to storage, to store it at an advantageous point for reshipment;" that "the shipper hasn't enough orders to ship it out directly to destination;" that all the coal "is consigned to Coalberg, Rochelle Park, for storage, billed at the regular tariff rates from the mine to the storage plant," and "it is held there awaiting orders from the consignee as to what is to happen to it." This course "relieves the car situation," and it "also helps the operator to continue operating."

There is an established tariff charge for the storage; and the argument, in brief, is that through the "contract agencies" of the Pennsylvania Company, as the owner of the plant, and Independent, as "a public warehouseman," the Erie Company "utilizes" this facility "solely to provide regular tariff in-transit services to its shippers for interstate shipments of coal from the Pennsylvania mines to ultimate destinations through, and beyond, Coalberg, with the facilities provided by the storage of the coal with a public warehouseman, as a regular transportation service facility over its line, pursuant to the demands of shippers;" and that the "tariff charges for this in-transit service are collected by the carriers directly from the shippers, and Erie, and participating carriers, bear the entire expense of the transit facilities."

But the coal is shipped to the purchaser or his consignee at Coalberg, Rochelle Park, and freight charges are collected

at the rate prescribed for transportation from the mines to that particular point, plus storage and unloading charges; and, when the coal is reshipped, there is, as we have seen, a new billing to the ultimate destination at the through interstate rate from the point of origin to the new destination, plus reloading charges, "as a continuance of the original interstate movement," and the balance is paid by the shipper at Coalberg. The ultimate destination is not determined until the owner gives shipping instructions. Compare *Federal Compress and Warehouse Co.* v. *McLean,* 291 *U. S.* 17; 54 *S. Ct.* 267; 78 *L. Ed.* 622.

Thus, the continuity of the carriage in interstate commerce is broken when the carried commodity is unloaded and stored at Coalberg for an indefinite period, subject to the owner's disposal, and thereby the coal becomes inter-mingled with the general mass of property having a *situs* within the State, and subject to the State's dominion and liable to taxation as such; and the stored coal retains that character and status until it is again shipped in interstate commerce. It does not become the subject of carriage in interstate commerce by reason of its conveyance by rail from Coalberg to other points in New Jersey.

The inquiry is whether the regulation lays an unconstitutional burden on interstate commerce, or a tax upon an independent local service, preliminary or subsequent to any interstate transportation. *New York, ex rel. Pennsylvania Railroad Co.* v. *Knight,* 192 *U. S.* 21; 24 *S. Ct.* 202; 48 *L. Ed.* 325; *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 *U. S.* 33; 60 *S. Ct.* 388; 84 *L. Ed.* 565. The question oft-times is one of remoteness and degree. The tax may be too remote and incidental to constitute a burden on the transaction of the commerce between the states. *Henderson Bridge Co.* v. *Kentucky,* 166 *U. S.* 150; 17 *S. Ct.* 532; 41 *L. Ed.* 953. A tax that only indirectly affects the profits or returns from interstate commerce is not within the ban of the commerce clause. *United States Glue Co.* v. *Oak Creek, supra.*

Property actually in transit in interstate commerce is exempt from local taxation. But if property be stored "for an indefinite time during such transit, at least for other than

natural causes or lack of facilities for immediate transportation, it may be lawfully assessed by the local authorities." *Kelley* v. *Rhoads,* 188 *U. S.* 1; 23 *S. Ct.* 259; 47 *L. Ed.* 359. There, Mr. Justice Brown found that the earlier cases declared the principle to be that, "while the property is at rest for an indefinite time awaiting transportation, or awaiting a sale at its place of destination, or at an intermediate point, it is subject to taxation. But if it be actually in transit to another state, it becomes the subject of interstate commerce and is exempt from local assessment." If there was a cessation of interstate commerce, the goods became subject to the jurisdiction of the state of their *situs.* Actual transit is the determinant. Here, movement in interstate commerce had ceased when the storage for an indefinite period began; and the coal then came within the dominion and protection of the state. As in the case of *Susquehanna Coal Co.* v. *South Amboy,* 76 *N. J. L.* 412; *affirmed,* 77 *Id.* 796, there was something more than an incidental interruption of the continuity of the transportation through the state. On a bill in equity to restrain the collection of taxes levied in that case, the Federal Supreme Court expounded the principle that, even though the delay in interstate transportation was but temporary, if it was availed of for "a business purpose and advantage," the commodity during that particular period "secured the protection of the state," and it was therefore subject to local taxation. *Susquehanna Coal Co.* v. *South Amboy,* 228 *U. S.* 665; 35 *S. Ct.* 712; 57 *L. Ed.* 1015.

The case of *Lehigh and Wilkes-Barre Coal Co.* v. *Junction,* 75 *N. J. L.* 68; *affirmed, Ibid.* 922, is to the same effect. It does not matter that here the goods were owned by the carrier. That does not serve to vary the application of the principle. The determinative question is whether there was a cessation of interstate commerce when the goods were placed in storage at Coalberg for an indefinite period of time; and it must be resolved in the affirmative. To borrow the language of Mr. Justice McKenna in the case of *General Oil Co.* v. *Crain,* 209 *U. S.* 211; 28 *S. Ct.* 475: 52 *L. Ed.* 754, the coal "required storage there—the maintenance of the means of storage; of putting it in and taking it from storage."

See, also, *State, Detmold and Cox, Pros.,* v. *Engle,* 34 *N. J. L.* 425; *State, Lehigh and W. Coal Co., Pros.,* v. *Carrigan,* 39 *Id.* 35.

It is also urged that the Erie Company "and its agents" conduct "a common carrier public service facility for the transportation and in-transit storage of coal at Coalberg, under franchises and authority conferred" by the State of New Jersey, and it therefore cannot be required "to obtain a municipal license for the privilege of exercising its franchise."

Obviously, the franchise grant to the railroad company does not render immune from regulation and taxation under section 40:52–1 (g) and 40:52–2, *supra,* a public warehouse business conducted by another, even though the operator be one of its corporate subsidiaries. The question is essentially one of legislative intention; and there is no indication whatever of a purpose to exempt a public warehouse of this category from the operation of the cited statute, simply because the railroad company uses the facility for what it terms in-transit storage after the movement in commerce has come to an end.

And we perceive no force to the contention that the license fee is arbitrary, unreasonable and prohibitory, and repugnant to federal and state constitutional guaranties, in that (1) the license fee is measured on a square foot basis "without relation to volume of business conducted, tons of coal in storage, or gross or net earnings of the operation;" (2) the fee is fixed "without relation to the value of the privilege of conducting the business," and is exorbitant; and (3) the fee is in *quantum* such as will "prevent the conduct of this interstate business within the municipality."

A tax on a public warehouse graduated according to storage capacity is familiar legislative practice. *Vide Federal Compress and W. Co.* v. *McLean, supra.* The license has reference only to the public warehouse business transacted at the warehouseman's established place of business within the state. *W. W. Cargill Co.* v. *Minnesota,* 180 *U. S.* 452; 21 *S. Ct.* 423; 45 *L. Ed.* 619. And under the ordinance in the case at hand, the warehouse corporation may protect itself against

the inclusion of areas not devoted to storage in the calculation of the tax. There is a presumption that the tax is reasonable in amount; and the burden rests upon the challenger to overthrow that presumption. It has not been sustained here. There is not such disparity between the "value of the privilege" and the levy as would render the ordinance arbitrary and discriminatory. The parties are in disagreement as to the *quantum* of the tax upon the stored coal per ton. Based upon respondent's estimate of total plant area and capacity, the tax per ton would amount to $2\frac{1}{4}$ cents, while the personal property tax would range between 29 cents and 58 cents per ton. From 1903 to 1940, when tax exemption was claimed under section 54:4-3.20, the plant was successfully managed notwithstanding that property taxes were paid on the stored coal in an amount not less than the current license tax.

And there is no merit in the contention that the municipality does not possess power under the cited enabling act "to penalize an employee because his employer fails to comply with a licensing ordinance," and therefore the conviction of the individual respondent Thompson, cannot be sustained.

Under the ordinance, no person, firm or corporation may "work in, occupy, or, directly, or indirectly in any manner whatsoever, utilize any place or premises" in which the storage business is conducted without the license therein prescribed. This is the offense of which Thompson was convicted. It was within the competency of the local legislative body to render this a punishable offense, essential to the enforcement of the policy of the ordinance; the power is an integral part of the general grant of authority to license and regulate contained in section 40:52-1 (g) and 40:52-2, *supra.*

Lastly, it is said that the ordinance imposes excessive fines and penalties in contravention of article I, paragraph 15, of the State Constitution.

The penalty prescribed for a violation of the ordinance is imprisonment for a term not exceeding 90 days, or a fine not exceeding $200, or both, with additional provisions that each day during which a violation "shall continue shall constitute a separate offense;" that the magistrate may, in his discretion, imprison one so convicted for a term not exceed-

ing 90 days, "in default of the payment of any fine;" and that execution may issue against goods and chattels to recover an unpaid fine.

We are not called upon to determine the validity of all these sanctions. A fine of $200 was the penalty imposed upon each of the convicted respondents, Independent Warehouses, Inc., and Thompson; and a fine in this amount coupled with imprisonment for 90 days cannot reasonably be deemed excessive in constitutional intendment. *Vide R. S.* 40:49–5. The ordinance contains a provision that in case "any section or part" thereof shall be held illegal or unconstitutional, such invalidity "shall not be construed as impairing the force and effect of the remainder of the ordinance." If it be conceded *arguendo* that the cumulative penalty clause is invalid in whole or in part, the remainder of the provision for sanctions is severable and would stand unaffected.

The judgments of the Supreme Court are accordingly reversed, and the judgments of conviction are affirmed.

*For affirmance*—WELLS, DILL, JJ. 2.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, DONGES, HEHER, PERSKIE, COLIE, OLIPHANT, RAFFERTY, FREUND, MCGEEHAN, JJ. 11.