93 N.J. Super. 392 (1967)
226 A.2d 23
BELLEVILLE CHAMBER OF COMMERCE, A CORPORATION OF THE STATE OF NEW JERSEY, ET AL., PLAINTIFFS-RESPONDENTS,
v.
TOWN OF BELLEVILLE, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1966.
Decided January 13, 1967.
*394 Before Judges GAULKIN, LEWIS and LABRECQUE.
Mr. Jack J. Soriano argued the cause for appellant (Messrs. Marinello, Henkel & Soriano, attorneys).
Mr. Albert Burstein argued the cause for respondents (Messrs. Wolf, Baumann & Burstein, attorneys).
*395 The opinion of the court was delivered by GAULKIN, S.J.A.D.
Plaintiffs are Belleville Chamber of Commerce (hereafter the Chamber) and the owners of a number of businesses located in Belleville. Their complaint in lieu of prerogative writs challenged the validity of a 1964 ordinance which provided for the licensing of numerous types of businesses and fixed fees therefor. In the alternative, the complaint asserted that even if the ordinance was basically valid, the fees were unreasonable and discriminatory.
The trial judge rendered an opinion which is reported in 91 N.J. Super. 32 (Law Div. 1966). Pursuant thereto, he entered judgment that the ordinance was basically valid "and shall remain in effect," but that section 19 thereof, which fixed the fees, was "unreasonable and invalid," and that the ordinance was totally inapplicable to automobile dealers, automobile service stations and coal dealers because they "are licensed pursuant to State statutes * * *." The balance of the judgment is not material to the issues before us.
The Defendant town appeals. There is no cross-appeal. Hence we deal only with the above portions of the judgment and with only those parts of the trial judge's opinion which relate thereto.
Section 10 of the ordinance provided:
"The Issuing Officer, shall prior to referring any application to the Municipal Council request a report from the Chief of Police, which report shall contain information as to whether:
(a) The conduct of the subject matter of licensing, or proposed conduct thereof, would be injurious to public safety or morals.
(b) The facility creates or will create unreasonable interference with traffic.
(c) The facility by reason of the nature of its operation, attracts undesirable persons and causes congregations giving rise to commission of criminal offenses, disorderly persons act offenses, acts of juvenile delinquency, or municipal ordinance violations on or about the premises or activity licensed.
The Chief of Police shall thereupon report the same in writing with the grounds therefor and his recommendations.
The Issuing Officer shall also request the Building Inspector to inform him of the Zoning requirements in any area in which a licensed business is to be conducted.
*396 Where the processing or handling of food is the subject of the business to be licensed the Issuing Officer shall request a report from the Health Officer.
A report shall also be obtained from the Fire Chief as to whether or not any premises utilized in any licensed business meet the requirements of the Fire Prevention Code."
The ordinance said that the "Issuing Officer" shall mean the person designated to accept applications and collect fees.
Section 11 of the ordinance provided:
"All Licenses shall be approved by Resolution of the Municipal Council. The Council shall examine the qualifications of any applicant for a license or renewal thereof to determine if the said applicant or licensee would conduct the licensed activity in a lawful manner and in accordance with the general laws and statutes of the State and ordinances of the Town of Belleville and shall be guided in making its determination by the following factors which shall be the standards upon which the determination of the Council shall be based: 
(a) The Zoning Ordinance of the Town of Belleville.
(b) The Building Code.
(c) The Sanitary Code of the Town of Belleville.
(d) Any and all general laws and public health statutes, and codes of the State of New Jersey applicable to Municipalities.
(e) The Fire Prevention Code.
(f) The reports of all municipal officers required under Section 10 hereof.
(g) Existence of any convictions of any crimes, the reasons therefor and the demeanor of the applicant subsequent thereto.
(h) The license history of the applicant, whether such person in previously obtaining a license in this Town or any other municipality has had such license rejected or suspended, the reasons therefor and the demeanor of the applicant subsequent to such actions, the timeliness of past applications for licenses, and the applicant's continued compliance with all license requirements after having been granted any previous licenses.
(i) Such other facts relevant to the general personal history of the applicant as may be necessary to a fair determination of the eligibility of the applicant to conduct the licensed activity."
Section 17 of the ordinance provided:
"The applicant for the renewal of a license shall submit an application for such license to the issuing officer on forms provided by him. The application for a renewal license shall require the disclosure of such information concerning the applicant's demeanor and conduct *397 and the operation of applicant's business during the preceding licensing period and such other information as is reasonably necessary to the determination by the Municipal Council of applicant's eligibility for a renewal license. An inspection shall be conducted of the subject matter of licensing where required by regulations or by direction of the Council. The fee for renewal of any license shall, unless otherwise provided by ordinance, be the same as the original fee for such license."
The trial court held:
"The standards recited in subsections (a), (b), (c) and (e) are valid areas of municipal regulation but incorporating them as criteria in this ordinance does not give legitimacy to the enactment. The zoning, building, sanitary and fire codes of Belleville must be self-enforcing ordinances. * * *
If denial of a license under the present ordinance is aimed at imposing an additional penalty on a business that violates any of these codes, or those referred to in subsection (d), there is no mention of this intent in the ordinance. Secondly, it does not appear that the municipal council must deny a license if there is a violation of any of the codes mentioned in subsections (a) through (e). Thus, violation of any of these provisions may or may not lead to the denial of a license. This appears to be within the discretionary powers of the municipal council. If the council may issue a license despite the violation of one or more of the standards listed in the ordinance, it is unreasonable to sustain the ordinance on the ground that it is another means of enforcing legitimate regulatory functions.
The intent and function of subsections (g), (h) and (i) are clearer than those standards which have already been discussed and are valid as proper exercises of the police powers allotted to municipalities. * * *." (91 N.J. Super., at p. 35)
Therefore, the trial court concluded that the reasonableness of the license fees may not be predicated upon the cost of making inspections necessitated by (a), (b), (c) and (e) but must be calculated on the cost of "[g]athering information from and about the license applicant's background, demeanor and qualifications to operate a business," pursuant to subsections (g), (h) and (i). On that basis, the trial court said it was
"* * * unable to see any justification for having varying fees dependent upon square footage or the number of machines or seats, etc., when the license is in reality a means of gathering information for *398 the governing body and its law enforcement officers. It makes no difference if an applicant owns one vending machine or six such machines, the ordinance merely seeks to elicit pertinent information about the applicant who will be responsible for the operation of the licensed machines. Likewise, the same can be said about the operator of a `neighborhood candy store' and a supermarket or furniture showroom. There is no need to review every fee; it will suffice to say that it is unreasonable both to have flat fees for certain businesses and fees graduated according to the number of square feet or units involved for other businesses and generally to differentiate on the basis of square feet or the number of units in the business." (at p. 36).
We find ourselves unable to agree with the trial court's major premise. Assuming the basic validity of the ordinance, as we must since there is no cross-appeal, we see no reason why compliance with other ordinances of the town and pertinent state laws may not be made a pre-condition of the issuance or renewal of a license, or part of the regulation of the licensed business. The local board of health may enforce state health laws, Itzen & Robertson, Inc. v. Board of Health of Oakland, 89 N.J. Super. 374, 379 (Law Div. 1965), affirmed in 92 N.J. Super. 241 (App. Div. 1966), and there may be other "general laws * * * and codes of the State of New Jersey applicable to Municipalities" which would fall under section 11(d). It seems to us immaterial that other town ordinances, such as the building, zoning, sanitary and fire codes, permit or even require inspections, or that the municipality already has officers and employees whose duty it is to enforce such state laws, ordinances and codes. That being so, we see no reason why those who are to be inspected should not pay a reasonable fee for the inspections to insure compliance, or why the cost of such inspections, even though required by other laws or ordinances, may not properly be an element in determining the reasonableness of the fees imposed by a municipality's general licensing ordinance.
In Weiner v. Borough of Stratford, County of Camden, 15 N.J. 295 (1954), plaintiff was denied a license to open an "auction store." He sued "to set aside the ordinance as invalid in toto" because it was not regulatory but purely for *399 revenue. In fact, the ordinance provided "that the fees herein imposed for such licenses are imposed for revenue." The Supreme Court conceded that "the ordinance is singularly wanting in regulatory features * * * the only provisions suggestive of regulation are those which condition the issuance of licenses upon compliance by the licensee with safety laws and ordinances, and, in the case of theatres and other places of amusement, require the written certification of such compliance from the building inspector and the chief of the fire department." The court held that these provisions, meager as they were, were enough to make the ordinance regulatory and valid, even though their "paucity" made the amount of the fees suspect. As to that, the court said:
"The annual license fees range from $5 to $100 (all but eight businesses pay a $5 fee; an auction store pays the $100 fee), and the paucity of regulatory provisions is strongly suggestive that these fees are unreasonably in excess of the regulatory costs and are in actuality imposed solely to raise revenue.
However, the disparity is not so obvious that we can reach a conclusion without evidence of the relation of the fees to regulatory costs, and there is no evidence bearing upon that question in the record. In the circumstances we are unable to determine the question." (at p. 298)
In Independent Warehouses, Inc. v. Scheele, 134 N.J.L. 133 (E. & A. 1945), the court summarized the provisions of the ordinance which it sustained as follows:
"If `perishable goods' are stored upon the licensed premises, the licensee is under a duty to comply with all health regulations `required by any federal, state or municipal authority.' He is also enjoined to observe all police and fire regulations laid down by the local `police and fire authorities.' And there is provision for inspection of the premises by the local police, fire and health authorities, and a requirement that the storage of `any inflammable or combustible matter' thereon shall be immediately reported to the governing body." (at p. 135)
It seems to us that the ordinance here under attack is, if anything, more detailed and specific than those in Weiner and Scheele. Therefore, the inspections called for by it are *400 properly part of the regulatory scheme and the cost thereof a proper basis for calculating the reasonableness of the fees.
Plaintiffs introduced evidence concerning the municipality's budget over several years and the amount of time certain officials expended on the administration of the ordinance. They showed that $18,818 was received in license fees in 1965, while much less was received in prior years, the license fee then being only $1; and that no new employees were hired to administer the ordinance. However, plaintiffs introduced no evidence regarding the actual cost of administering the ordinance or to prove the unreasonableness of the fees as compared with the cost to the municipality of exercising its regulatory powers.
On the other hand, the town showed the time and expense involved in administering the ordinance. The health officer stated that each of his inspections cost the city a minimum of $25 and that he had 638 applications to act upon in 1965. He also revealed that the size of the premises inspected made a difference with regard to the time he spent in making a license fee inspection. The police chief said that his department processed 706 applications in 1965, and that each application took an hour to process at a cost of $3 an hour. The fire chief testified that his department spent about 15-20 minutes inspecting each applicant's premises, and noted that the time of each inspection varied with the size and nature of the establishment.
The municipal manager testified:
"Q. As a result of your study what did you find in regard to the money collected under the ordinance prior to 1965 and the expenses? A. I found that we were receiving approximately a little less than $4,000.00, $3,900 and a few odd dollars, for a function which was costing the Town at an educated guess or judgment of $27,500.00.

* * * * * * * *
Q. And the effort on your part in framing Ordinance 1702 was to meet these costs?
A. Yes, only to meet these costs.
Q. I see. Did you ever say to anyone that this was an easy way to raise money?
A. I never said a thing at any time anywhere to anyone.
*401 Q. To anyone?
A. Absolutely.
Q. I see.
A. Because this ordinance, sir, to follow your question does not meet with our cost of operation."
It seems to us clear from the record that the total income from the licenses is reasonably related to the expense of administration and regulation of the licensed businesses as a whole.
Plaintiffs contend that, even so, the fees exacted from particular businesses are unreasonable and discriminatory as to such businesses. The ordinance provides for flat fees for a number of businesses regardless of size, e.g., automobile wreckers $200; auto service stations $50; coal and oil dealers $50; roller skating rinks $100; theatres and motion pictures $250. For other businesses the fee varies according to the quantity of equipment used, e.g., automatic vending machines $5 to $10 for the first machine, $2 for each additional machine; billiard parlors $50 first table, $10 for each additional table; restaurants, less than 50 seats, $25, more than 50 seats, $50. Finally, for "food, department and furniture stores, markets and all stores wherein merchandise is sold at retail," the fee is based upon "square feet total floor area," on a graduated scale ranging from a minimum of $15 for 1,500 square feet to a maximum of $275 for over 10,500 square feet.
Two of the plaintiffs are automobile service stations, from whom a $50 license fee is required. The remaining plaintiffs (other than the Chamber) are called upon to pay on a square foot basis ranging from $15 to $200. No plaintiff pays more than $200.
The individual plaintiffs contend that all of the license fees fixed by the ordinance (including those which do not affect their businesses) unreasonably exceed the sums necessary to meet the cost of administration and regulation. We hold that each plaintiff may attack only those fees which are unreasonable or discriminatory as applied to his business. *402 The Chamber takes the position that it is entitled to speak for all of its 78 members subject to the ordinance, even though they are not parties to the action. As we have said, at the trial level plaintiffs attacked the basic validity of the ordinance and sought to have it nullified in toto. Assuming that the Chamber had standing to appear as a plaintiff below to join in that attack, it has no standing in this appeal, which challenges only the reasonableness of the fees and whether the fees imposed upon particular businesses discriminate unlawfully against the individual plaintiffs. The Chamber is not required to pay a license fee. It may not speak for its members. Indeed, an examination of the list of its members furnished by the Chamber to us indicates that the interests of some of the members may conflict.
The burden of proving that the fees are unreasonable or discriminatory is, of course, upon plaintiffs. We hold that the record does not show that the fees are unreasonable or discriminatory as against any plaintiff.
Plaintiffs concede that license fees fixed under N.J.S.A. 40:52-1, 2 may provide a reasonable excess over the cost of regulation and administration, and that this excess may be for revenue. The statute so provides and the cases so hold. Garden State Racing Association v. Cherry Hill Tp., 42 N.J. 454, 461 (1964); Bellington v. East Windsor Tp., 17 N.J. 558, 564-565 (1955); Salomon v. Jersey City, 12 N.J. 379 (1953); Weiner and Scheele, supra. In Garden State Racing Association v. Cherry Hill Tp., the township imposed a license fee of $10 to $100 on parking lots, depending on lot capacity, plus an additional five cents for each vehicle parked. It was calculated that this would cost plaintiff, which had a parking area adjacent to its race track, about $20,000 per year. The township defended this fee in part upon testimony of "the cost of maintenance caused by traffic from plaintiff's lots * * * caused by the heavy flow of cars and busses and the greater need of traffic control by the police during the racing season." The Supreme Court held that this was a valid basis for the calculation of the fees, saying:
*403 "As noted above, the expected revenue from plaintiff was stipulated to be about $20,000 per year. An estimate of $10,000 was given by defendant as to the ordinances' cost of enforcement, its public works department submitted a figure of $5,000 as representing the additional maintenance and repair costs occasioned by the racetrack traffic and the police lieutenant testified to additional work and supervision resulting from the added heavy racetrack traffic. Therefore, it cannot be said that the $20,000 bears an unreasonable relation to the impact of the operation upon the community including the costs of the enforcement of the ordinances. See Bellington v. East Windsor Township, 17 N.J. 558, 566-567 (1955). Plaintiff has not proved that the surplus of revenue over costs is so great as to invalidate the ordinances." (at p. 464)
Two things must be noted about the Garden State case. First, the fees applied as well to parking lots not connected with the race track and which did not present the problems of traffic and road damage created by Garden State's parking. Second, the township obtained money through the license fees to help defray the cost of services which it would have had to supply even if it received no license fees  road maintenance and repair and traffic control.
It is true that Belleville would be obliged to enforce state laws and regulations and its own police, fire and other regulatory ordinances and codes, even if it received no license fees, but there is no law or rule that says how diligently Belleville must enforce them or with how many men and inspections. We are told that in 1965, 625 licenses were issued. It is reasonable to assume that with more revenue, inspections and enforcement can be more diligent. Some businesses doubtless require more inspections than others, but we do not think it essential that the fee for each licensee be geared precisely to the regulation and inspection of that licensee. No plaintiff has demonstrated that it is unreasonable to establish a common scale for his type of business, or to base his license fee on the area occupied by him. The license fee was fixed on that basis in Independent Warehouses v. Scheele. And the record does not establish that any plaintiff has been discriminated against.
*404 As we have said, the trial court held that the ordinance may not apply to automobile dealers, automobile service stations and coal dealers. We disagree. Chaiet v. City of East Orange, 136 N.J.L. 375 (Sup. Ct. 1947); Mills v. Mosher, 128 N.J.L. 546 (Sup. Ct. 1942).
The portions of the judgment appealed from are reversed. No costs.