# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CLEAN HARBORS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N15C-07-081 MMJ CCLD |
| | ) | |
| UNION PACIFIC CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: January 11, 2017
Decided: March 28, 2017

Upon Defendant Union Pacific Corporation's Motion for Summary Judgment
**DENIED**

Upon Defendant Union Pacific Corporation's Motion for Partial Summary
Judgment Against Clean Harbors' Damages Claim
**GRANTED IN PART, DENIED IN PART**

Upon Union Pacific Corporation's Motion *In Limine* To Exclude The Expert
Opinions of Stan V. Smith
**GRANTED**

## OPINION

Ann L. Al-Bahish, Esq. (Argued), Jackson Gilmour & Dobbs, P.C., Norton A. Colvin, Jr., Esq., Mitchell C. Chaney, Esq., Colvin, Chaney, Saenz & Rodriguez, LLP, James W. Semple, Esq., Cooch and Taylor, PA., Attorneys for Union Pacific Corporation

Gary S. Matsko, Esq. (Argued), Christopher J. Marino, Esq. (Argued), Paul L. Feldman, Esq., Davis Malm & D'Agostine, P.C., Richard L. Renck, Esq., Christopher M. Winter, Esq., Jaret P. Hitchings, Esq., Duane Morris LLP, Attorneys for Plaintiff Clean Harbors, Inc.

**JOHNSTON, J.**

## PROCEDURAL CONTEXT

This litigation arises from an alleged breach of an environmental indemnity provision ("Indemnity") in a Stock Purchase Agreement ("SPA"). On July 9, 2015, Clean Harbors, Inc. ("Clean Harbors") filed breach of contract and breach of implied covenant of good faith and fair dealing claims against Union Pacific Corporation ("UPC"). Clean Harbors seeks to recover remediation costs for contamination pursuant to the Indemnity.

The Court will address three motions: UPC's Motion for Summary Judgment; UPC's Motion for Partial Summary Judgment Against Clean Harbors' Damages Claim; and UPC's Motion *in Limine* to Exclude the Expert Opinions of Stan V. Smith.

## STATEMENT OF FACTS

UPC's subsidiary, USPCI, Inc., owned and operated a licensed hazardous waste facility located in Wichita, Kansas (the "Wichita Facility") from 1988-1994. UPC transferred the Wichita Facility to Laidlaw, Inc. and Laidlaw Transportation, Inc. ("Laidlaw") through the SPA in 1994. Safety-Kleen, Inc. succeeded Laidlaw and Clean Harbors succeeded Safety-Kleen. Clean Harbors has owned and operated the Wichita Facility since 2002.

The SPA includes a choice of law provision that designated Delaware law to govern the SPA. Section 8.10(a) of the SPA contains the Indemnity.

> From and after the HWMA Closing, and subject to the limitations in this Section 8.10(a), Union Pacific shall reimburse, indemnify, defend and hold harmless Laidlaw Inc., Laidlaw, HWMA, Clive and the Subsidiaries from, against, and in respect of 80% of all Environmental Liabilities that may be imposed upon, asserted against or incurred by Laidlaw Inc., Laidlaw, HWMA, Clive or any Subsidiary and which (i) *are attributable to a Third Party Claim*, (ii) arise out of or in connection with acts or omissions occurring prior to the HWMA Closing Date, (iii) are incurred with respect to the HRI Wichita facility located in Wichita, Kansas, and (iv) are not attributable to a change in Environmental Laws occurring after the HWMA Closing Date. Union Pacific shall not have any liability under this Section 8.10(a) until the aggregate of *all Environmental Liabilities covered under this Section 8.10(a) exceeds $2,000,000 and then only to the extent of 80% of such excess and only with respect to amounts spent within 20 years after the HWMA Closing Date.*

(emphasis added).

> Section 8.4(b) of the SPA sets forth certain indemnification procedures.

> In the event an Indemnified Party shall have a Claim against any Indemnifying Party hereunder that *involves a third party claim* that could give rise to a right of indemnification under this Agreement (a "Third Party Claim"), the Indemnified Party shall transmit to the Indemnifying Party a *Claim Notice* relating to such Third Party Claim. During the 30-day period following receipt by an Indemnifying Party of a Claim Notice or such shorter period (but no shorter than 15 days) as is necessary for the Indemnified Party to respond to a complaint or summons (the "Election Period"), an Indemnifying Party shall notify an Indemnified Party (i) whether the Indemnifying Party disputes its potential liability to the Indemnified Party under this Article VIII with respect to such Third Party Claim or (ii) if the Indemnifying Party does not dispute its liability to the Indemnified Party, whether an

2

Indemnifying Party desires, at the sole cost and expense of such Indemnifying Party, to defend the Indemnified Party against such Third Party Claim.

(emphasis added).

## *EPA and KDHE*

UPC's Resource Conservation and Recovery Act ("RCRA") Permit became effective on April 7, 1995. UPC obtained the RCRA Permit from the Environmental Protection Agency ("EPA"). The RCRA Permit was necessary for the continued operation of the hazardous waste facility at the Wichita Facility. The RCRA Permit identified corrective actions that UPC or its successors would be required to undertake at the Wichita Facility. The RCRA Permit was made applicable to Laidlaw and its successors through the SPA. As a result, the RCRA Permit was effective as to Clean Harbors.

The Wichita Facility was part of a collection of land in Northern Wichita known as the Northern Industrial Corridor Site ("NIC"). Lands in the NIC fell under the purview of the Kansas Department of Health and Environment ("KDHE"). The KDHE deemed a landowner whose property was contaminated, and contributing to the contamination of groundwater within the NIC boundaries, a Potentially Responsible Party ("PRP"). The KDHE required PRPs to address or clean up such contamination on their properties.

The EPA, a federal agency, and the KDHE, a state agency, exercise separate,

3

but interrelated authority concerning remediation of environmental contamination. In this case, the two agencies were simultaneously reviewing issues relating to the Wichita Facility. The EPA and KDHE processes and procedures are parallel, but intertwined. Clean Harbors owed certain obligations to the EPA and the KDHE, separately.

In 1998 Laidlaw received a demand from the EPA to submit a RCRA Facility Investigation ("RFI") "work plan" within 120 days. An RFI's purpose was to identify the areas of contamination and to determine whether any affirmative remediation would have to be completed.

That same year Laidlaw received notice from the KDHE that it was a NIC PRP. On May 28, 1998, Laidlaw provided a Claim Notice to UPC regarding the EPA demand. On October 30, 1998, Laidlaw provided an additional Claim Notice to UPC regarding the NIC notification.

Laidlaw began work pursuant to the RFI in 1998. Laidlaw continued this work until 2002, when Clean Harbors became the owner of the Wichita Facility.

In March of 2012, the KDHE issued its Declaration of Corrective Action Decision ("Declaration") and Final Corrective Action Decision For Interim Groundwater Remediation ("NIC Decision"). The Declaration stated in relevant part:

> The Final Corrective Action Decision for Interim Groundwater Remediation presents the corrective action selected by the Kansas

Department of Health and Environment (KDHE) for the North Industrial Corridor (NIC) Site located in Wichita, Kansas. . . . The preferred remedial actions selected for groundwater remediation for each GWU [Ground Water Unit] are as follows: For GWU-1, Source Abatement and MNA . . . . In selecting and declaring this corrective action, KDHE believes implementation of the remedial actions will have a beneficial effect on health and the environment.

The NIC Decision stated in relevant part:

KDHE has selected a final remedy for the Site after reviewing and considering all information submitted during the 30 day public comment period. . . . The Administrative Record file includes all pertinent documents and site information that form the basis and rationale for selecting the final remedy. . . . [T]he City of Wichita proposed to divide the NIC Site into six groundwater units to streamline the evaluation and eventual selection of remedial actions for the NIC Site . . . . *Groundwater Unit 1 (GWU-1)* . . . Confirmed source areas within GWU-1 include: . . . Safety-Kleen/Clean Harbors . . . . Individual source abatement is central to the overall success of any site-wide remedial action. Therefore, to highlight the importance of this aspect, source abatement has been explicitly incorporated into the preferred remedial strategy for each GWU. . . . On the basis of information obtained during the RI, Alternative GWU1-2, Source Abatement and MNA, with a groundwater extraction and treatment contingency (e.g., Alternative GWU1-4), may facilitate groundwater restoration within a reasonable timeframe.

The NIC Decision listed the preferred alternative to Groundwater Unit 1 as "GWU1-2: Source Abatement and MNA."

In December of 2012, Clean Harbors submitted its work plan to the EPA. On September 28, 2012, Clean Harbors submitted supplemental reports to the EPA. The RCRA Permit was renewed the same day. The EPA then provided comments and described steps to selecting a final remedy on March 7, 2013. On

5

April 11, 2013, Clean Harbors presented an opportunity to the EPA to advance remediation under the Indemnity. On June 5, 2013, Clean Harbors met with UPC to provide an update on the RFI. At this meeting Clean Harbors predicted certain Corrective Measures that could be imposed by the EPA.

On October 13, 2013, the EPA responded to Clean Harbors and allowed remediation but did not require it. On February 7, 2014, Clean Harbors submitted a Claim Notice to UPC regarding a KDHE letter, in which KDHE requested oversight costs from the NIC. On February 27, 2014, Clean Harbors informed the EPA that Clean Harbors decided to excavate soils for economic reasons and asked the EPA for an expedited approval of the interim measure.

On March 4, 2014, Clean Harbors provided UPC with a Claim Notice for reimbursement of "response costs" from the EPA. On March 25, 2014, UPC began disputing claims. On July 31, 2014, Clean Harbors received approval of the work plan from the EPA. On December 31, 2014, the Indemnity period ended.

## STANDARD OF REVIEW

Summary judgment is granted only if the moving party establishes that there are no genuine issues of material fact in dispute and judgment may be granted as a matter of law.[1] All facts are viewed in a light most favorable to the non-moving

---

[1] Super. Ct. Civ. R. 56(c).

6

party.[2]  Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if there is a need to clarify the application of law to the specific circumstances.[3]  When the facts permit a reasonable person to draw only one inference, the question becomes one for decision as a matter of law.[4]  If the non-moving party bears the burden of proof at trial, yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment may be granted against that party.[5]

## ANALYSIS

### *UPC's Motion for Summary Judgment*

The dispositive question is whether Clean Harbors made a third-party claim under the SPA that would trigger Clean Harbors' entitlement to the costs of remediation.

UPC concedes that the EPA and KDHE are not parties to the SPA. Therefore, the EPA and KDHE are third parties.

Clean Harbors initiated its investigatory process upon providing its first EPA Claim Notice to UPC on May 28, 1998.  In total, Clean Harbors has provided four Claim Notices to UPC.  The May 28, 1998 Claim Notice was the first Notice. Clean Harbors informed UPC that RCRA had issued a demand to Clean Harbors to

---

[2] *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991).
[3] Super. Ct. Civ. R. 56(c).
[4] *Wooten v. Kiger*, 226 A.2d 238, 239 (Del. 1967).
[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

7

submit a work plan for an RFI. The second Claim Notice was on October 30, 1998. The purpose of this Claim Notice was to inform UPC of the NIC work being conducted by Clean Harbors. On February 7, 2014, Clean Harbors provided UPC with a third Claim Notice regarding KDHE's requested oversight costs. On March 4, 2014, Clean Harbors gave UPC the fourth Claim Notice. This Notice addressed EPA's requested "response costs."

On March 29, 2012, KDHE released the NIC Decision. KDHE required groundwater remediation as a corrective action. On July 31, 2014, the EPA sent a letter to Clean Harbors, approving Clean Harbors' Interim Remedial Measures work plan.[6]

Clean Harbors performed the remediation approved by the EPA. The work was completed by Clean Harbors' affiliates. Clean Harbors expedited the work in order to invoice UPC in time to meet the December 31, 2014 indemnification cutoff. Clean Harbors requested indemnification from UPC in the form of costs plus markups.

Section 8.4 of the SPA provides that the Indemnified Party shall transmit a Claim Notice to the Indemnifying Party "[i]n the event an Indemnified Party shall have a Claim against any Indemnifying Party hereunder that *involves a third party claim* that could give rise to a right of indemnification under this Agreement (a

---

[6] At this time, the EPA's Facility Inspection (pursuant to the RCRA) had not yet been completed. This inspection related to the 1995 RCRA Permit.

"Third Party Claim") . . . ." (Emphasis added.) Here, Clean Harbors' investigation and remediation efforts resulted from the involvement of the EPA and the KDHE. It is undisputed that the EPA and the KDHE are not parties to the SPA. As such, the EPA and the KDHE are third parties. The EPA and the KDHE approved a remediation plan. This remediation plan qualifies as at least an interim measure.

The Court finds as a matter of law that Clean Harbors' remediation work is an Environmental Liability pursuant to Section 8.10(b) of the SPA. Section 8.10(b) of the SPA provides that "Union Pacific shall . . . indemnify . . . Laidlaw, Inc., Laidlaw, HWMA, Clive and the Subsidiaries . . . in respect of 80% of all Environmental Liabilities that may be . . . incurred by Laidlaw, Inc., Laidlaw, HWMA, Clive or any Subsidiary as a result of a requirement under Environmental Laws . . . ." The remediation work is attributable to a Third Party Claim pursuant to Section 8.10(a) of the SPA because the work resulted from the involvement of the EPA and the KDHE.

Therefore, Clean Harbors is entitled to indemnification of the amounts spent prior to December 31, 2014, as provided by Section 8.10(a) of the SPA.

Nevertheless, the Court finds that genuine issues of material fact exist that must be resolved by the finder of fact. These issues include: (1) the reasonableness of the extent of remediation performed by Clean Harbors; (2) whether Clean Harbors complied with the SPA 8.4 Claims Notice Provisions; and (3) the amount

9

of indemnification that UPC owes Clean Harbors.

**THEREFORE,** UPC's Motion for Summary Judgment is hereby **DENIED.**

*UPC's Motion for Partial Summary Judgment on Damages*

The Court must decide whether Clean Harbors is entitled to more than its direct out-of-pocket costs either in the form of profits or lost opportunity costs.

It is undisputed that Clean Harbors used internal resources and outside vendors to investigate and perform remediation work to eliminate environmental contamination at the Wichita Facility. Clean Harbors' internal remediation projects were managed by "Discounted Operations," a department of Clean Harbors that acts as the project manager. Discounted Operations agreed to pay other divisions of Clean Harbors for services performed in furtherance of remediation work. However, no actual money changed hands between Discounted Operations and these branches. Instead, the payment was debited from Clean Harbors' reserve account for environmental liabilities. Nevertheless, the amounts charged by Clean Harbors to UPC included a value above the direct costs of remediation.

Section 8.7 of the SPA provides: "The amount of any Claim shall be reduced by any . . . other benefit received by the Indemnified Party as a result of any Claim. The Indemnified Party shall have the obligation to reasonably mitigate the losses to the Indemnifying Party from any Claim." Section 8.10 of the SPA provides that

the Indemnity only applies to "amounts spent" by Clean Harbors.

This case is analogous to *Crain Brothers., Inc. v. Duquesne Slag Products Company.*[7] In *Crain*, the United States Court of Appeals for the Third Circuit found that lost profits only may be recovered when lost profits are proved with reasonable certainty.[8] Crain, the indemnitee, sought damages for lost profits it allegedly incurred for work it self-performed. Crain argued that "if an independent contractor . . . performed this work for Crain, an item of profit would properly have been included in the charge."[9] However, the Court held that "Crain was out-of-pocket only the cost of the operation."[10] The Court went on to find that "Crain [was] entitled to be compensated fully for its losses and expenses as a result of the accident in suit, not to make a profit on the mishap."[11]

In this case, discovery has closed. The Court finds that there is no record evidence of actual specific lost opportunities. Recovery of lost profits and opportunities is not appropriate in this situation. Profits and markups do not qualify as "amounts spent" pursuant to Section 8.10(a) of the SPA. Mitigation of damages resulted in reduced remediation costs, which qualified as an "other benefit" under Section 8.7 of the SPA.

---

[7] 273 F.2d 948 (3rd Cir. 1959).
[8] *Id.* at 950.
[9] *Id.* at 952.
[10] *Id.* at 953.
[11] *Id.*

11

**THEREFORE,** UPC's Motion for Partial Summary Judgment Against Clean Harbors' Damages Claim is hereby **GRANTED IN PART.** The measure of damages, which may not include markups, lost profits, or lost opportunities, remains a question of fact.

### *UPC's Motion in Limine to Exclude the Expert Opinions of Stan V. Smith*

Clean Harbors offers Dr. Smith as an expert witness in the field of economics. The summary of Dr. Smith's intended testimony concerns opportunity costs, and an explanation to the jury of the economic principles that support the Service Providers charging an amount higher than their direct out-of-pocket costs.

The Court has found that Clean Harbors may not recover markups, lost profits, or lost opportunities as damages.

**THEREFORE,** UPC's Motion *in Limine* to Exclude the Expert Opinions of Stan V. Smith is hereby **GRANTED.**

## CONCLUSION

UPC's Motion for Summary Judgment is hereby **DENIED.** The Court finds that Clean Harbors is entitled to indemnification of the amounts spent prior to December 31, 2014, pursuant Section 8.10(a) of the SPA. The Court finds that genuine issues of material fact exist, including: (1) the reasonableness of the extent of remediation performed by Clean Harbors; (2) whether Clean Harbors complied with the SPA 8.4 Claims Notice Provisions; and (3) the amount of indemnification

12

that UPC owes Clean Harbors.

UPC's Motion for Partial Summary Judgment Against Clean Harbors' Damages Claim is hereby **GRANTED IN PART.** UPC may not recover lost profits, or markups, or lost opportunity costs. However, the Court finds that the measure of damages is a question of fact.

The Court has found that Clean Harbors may not recover markups, lost profits, or lost opportunities as damages. **THEREFORE,** UPC's Motion *in Limine* to Exclude the Expert Opinions of Stan V. Smith is **GRANTED.**

**IT IS SO ORDERED.**

The Honorable Mary M. Johnston

13